# FRANK MANIACI, Appellant, v. INTERURBAN EXPRESS COMPANY.

### In Banc, February 9, 1916.

**CORPORATION: Liability for Malicious Assault by Agent Upon Patron.** A corporation, an express company and a common carrier, which had delivered a consignment of fruit to plaintiff, who, after refusing on account of a shortage in the shipment to sign a receipt therefor until the company's agent would present his claim for an allowance for the shortage, returned at the agent's request, given by telephone, to defendant's office for the purpose of discussing a settlement of the matter, and when near the office was met by said agent, who demanded that plaintiff then and there sign said receipt, and when plaintiff under protest was in the act of signing it, suddenly drew a pistol and without warning shot plaintiff, is liable in civil damages, both actual and punitive, to plaintiff for the injuries resulting from said assault; and a second count in the petition in which knowledge by defendant of the agent's violent temper, quarrelsome disposition and unfitness for his position, in addition to such other facts, is charged, also states a cause of action.

> *Held*, by WOODSON, C. J., dissenting, with whom BLAIR, J., concurs, that the agent's act was a crime, personal to himself, in no way within the scope of his agency, and could not be authorized by the company, because unlawful, and being wholly unauthorized and unauthorizable, the company is not liable in civil damages for the injuries to plaintiff caused by his murderous assault.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher*, Judge.

REVERSED AND REMANDED (*with directions*).

*George H. Moore* and *Frank A. Thompson* for appellant.

(1) The master is liable even for the wanton and malicious acts of the servant if done in the scope of his employment. 2 Mechem on Agency (2 Ed.),

1522; Richberger v. Express Co., 73 Miss. 161, 31 L. R. A. 390; 6 LaBatt's Master & Servant (2 Ed.), sec. 2239a; Chicago Ry. Co. v. McMahon, 103 Ill. 485; Haehl v. Railroad, 119 Mo. 325; Bouillon v. Gas Light Co., 148 Mo. App. 462; Express Co. v. Sobel, 125 S. W. (Tex.) 925; Railroad v. Hack, 66 Ill. 238; Amusement Co. v. Martin, 62 So. (Ala.) 404; Bergman v. Hendrickson, 106 Wis. 434; Fishing Club v. Stewart, 9 L. R. A. (N. S.) 475. (2) It is an act of negligence upon the part of the principal to employ as an agent and place in charge of his premises or business one whom he knows or by the exercise of reasonable care should know to be a person of violent passions and ungovernable temper and a dangerous man. Dean v. Depot Co., 41 Minn. 360, 5 L. R. A. 442; 6 LaBatt's Master & Servant, 6676; Wanstall v. Pooley, 6 Cl. &. F. (Q. B.) 910; Christian v. Railroad, 79 Ga. 460; Railroad v. Hackett, 58 Ark. 381, 41 Am. St. 105; Carson v. Canning, 180 Mass. 461; Railroad v. Day, 34 L. R. A. 111; Richberger v. Am. Ex. Co., 73 Miss. 161, 31 L. R. A. 490; Express Co. v. Sobel, 125 S. W. (Tex.) 925. (3) Public service companies who invite the public to become their patrons owe a duty to such members of the public as accept their invitation to protect them from misconduct on the part of the servants and employees of said companies. The tendency of the most recent decisions is to hold the master to a stricter rule of liability rather upon the ground of a special duty toward the injured party being violated than upon the principle of *respondeat superior*. 6 Labatt's Master & Servant (2 Ed.), 6878; Dickson v. Waldron, 24 L. R. A. 483; 1 Jaggard on Torts, 263; Mallach v. Ridley, 9 N. Y. Supp. 922; Amusement Co. v. Martin, 62 So. 404; Swinarton v. Le Boutillier, 7 Misc. N. Y. 639, 148 N. Y. 752; Express Co. v. Sobel, 125 S. W. 925; Richberger v. Express Co., 73 Miss. 161, 31 L. R. A. 390; Dean v. Depot Co., 41 Minn. 360, 5 L. R. A. 442.

*H. R. Small* for respondent; *Fred Tecklenberg* of counsel.

(1)    While a demurrer admits as true all material facts which are well pleaded in the petition, it does not admit conclusions of law.  Pattison's Code Pleading (2 Ed.), secs. 925, 926.  (2)    The allegation of the amended petition that the servant was, in shooting plaintiff, acting "within the scope of his employment" is an allegation of a legal conclusion.  Snyder v. Railroad, 60 Mo. 413; Pattison's Code Pleadings (2 Ed.), sec. 435; Johannson v. Fuel Co., 72 Minn. 409.  (3) The master, while now held liable civilly to third persons for the servant's intentional wrongs committed "within the scope of the servant's employment" is not liable for the servant's intentional wrongs committed outside the scope of the servant's employment.  6 Labatt, Master and Servant, sec. 2244; Whiteaker v. Railroad, 252 Mo. 438.  (4)    An assault on a debtor by a servant employed to collect debts is outside the scope of his employment.  Collette v. Rebori, 107 Mo. App. 711; Milton v. Railroad, 193 Mo. 58.  (5)    Shooting is ordinarily outside the scope of a servant's employment and is only in exceptional cases within it. Mechem on Agency (2 Ed., 1914), sec. 1979; 26 Cyc. 1541.  (6)    The petition does not state a cause of action because (while it states facts that would make the servant liable) it states no facts which justify holding defendant as master liable for the shooting.  On the contrary, the shooting under the facts alleged is shown plainly to be outside the scope of any employment or employment duty stated in the petition.  The only duties at all inferable even from the petition are those incident to the employment of one in charge of an office and the duty to secure a receipt for goods previously delivered by defendant to plaintiff.  It was not within the scope of such employment or employment duties to suddenly, without warning, without just cause or pro-

vocation, wilfully, wantonly, maliciously and unlawfully shoot plaintiff twice. Snyder v. Railroad, 60 Mo. 413; Whiteaker v. Railroad, 252 Mo. 457; Collett v. Rebori, 107 Mo. App. 711; Bowen v. Railroad, 136 Fed. 306, 70 L. R. A. 915; Milton v. Railroad, 193 Mo. 58. (7) The wrong perpetrated must be shown to pertain to the particular duty of the servant to make the master liable. Farber v. Railroad, 116 Mo. 94. (8) The act of shooting under the allegations of the petition cannot "fairly be regarded as a natural incident to, a direct outgrowth of, a natural ingredient in the execution of the service which the master confided to the servant" in the case at bar. Mechem on Agency (2 Ed.), sec. 1962. (9) From appellant's second point it appears that by the second count and by the additional matter contained in the second count appellant now asserts he charged defendant with negligence in employing the agent and keeping him in charge of its office. If this be true, asserting negligence and intentional wrong in the second count renders it a *felo de se*. If the act was careless or negligent, it was not wilful, and *vice versa*. Raming v. Metropolitan Street Railway Co., 157 Mo. 507. But it appears plaintiff did not charge defendant with negligence, but simply alleged knowledge of the servant's propensities in order to aggravate, increase and to justify punitive damages on account of the wilful wrong of the servant. (10) Missouri law and the weight of authority is against the contention made in appellant's third point. 6 LaBatt, Master and Servant, sec. 2244; Mechem on Agency (2 Ed.), secs. 1963-1969; Collette v. Rebori, 107 Mo. App. 711; Bowen v. Railroad, 136 Fed. 306.

RAILEY, C.—This action was commenced in the circuit court of the city of St. Louis on March 16, 1912; and afterwards on the 18th day of October, 1912, and

during the October term of said court, an amended petition in two counts was filed in said cause, which, without caption and signatures, reads as follows:

"Plaintiff states that defendant is and was at all times hereinafter mentioned a corporation duly incorporated under the laws of the State of Illinois and doing business in the State of Missouri; that on and about the first day of February, 1911, defendant was engaged in and carrying on an express business as a common carrier of freight; that defendant had and maintained an office in the city of Edwardsville, Illinois; that said office was in charge of one Harry Joiner, who was the agent and servant of defendant; that defendant was at said time a merchant in said city of Edwardsville; that several days previous to the said first day of February, 1911, defendant in its capacity as a common carrier delivered to plaintiff a consignment of fruit, and that plaintiff refused to sign a receipt for same until the said Harry Joiner, the agent and servant of defendant, had agreed to present plaintiff's claim for an allowance for a shortage in the consignment; that upon the said first day of February, 1911, the said Harry Joiner, defendant's agent and servant, telephoned to plaintiff to come to the office of defendant for the purpose of discussing a settlement of the matter; and in response to said message plaintiff started to defendant's office as requested by defendant's servant; that near the office plaintiff met defendant's servant, the said Joiner, who demanded that plaintiff then and there sign a receipt for the said consignment of fruit; that plaintiff under protest started to comply with said demand and was in the very act of signing the receipt when the said Harry Joiner, being at the time the employee, agent and servant of the defendant company and acting within the scope of his employment as such agent and servant, did suddenly and without warning draw a pistol and without just cause

or provocation wantonly, maliciously and unlawfully shoot plaintiff twice, wounding him in the breast and shoulder.

"Plaintiff states that as a direct result of said injuries and assaults he suffered great bodily and mental pain and was confined to a hospital by reason thereof for a long period of time, to-wit, for the period of about one month, and thereafter was confined at his home to his bed and room for the period of about one month; that by reason of said injuries he was disabled and prevented from attending to his business and affairs for the space of about seven months; that he has suffered and will continue to suffer great bodily pain, annoyance, inconvenience and expense; that as a direct result of said injuries and assault he was compelled to procure and did procure necessary medical attention and treatment, which were then necessary, and still are, and will continue to be necessary for an indefinite period, and that on account of said services alone he has been put to the expense of about the sum of three hundred dollars.

"Plaintiff states that by virtue of the premises, he has been injured and damaged in body, mind, health, pain and suffering and loss of time and necessary expenses in the sum of ten thousand dollars actual damages and ten thousand dollars punitive damages, for both of which amounts, together with the costs in this behalf expended, plaintiff prays judgment.

"2.

"For a second cause of action, plaintiff states that defendant is and was at all times hereinafter mentioned a corporation duly incorporated under the laws of the State of Illinois and doing business in the State of Missouri; that defendant on or about the first day of February, 1911, was engaged in the express business and was acting as a common carrier of

freight; that for the purposes of its business it maintained an office in the city of Edwardsville, Illinois; that defendant had as an agent and servant in charge and control of said office one Harry Joiner; that said Harry Joiner was a person of violent temper, quarrelsome disposition and without control over his passions; that said Harry Joiner was a dangerous and unfit person to place in such a position; that said Joiner's dangerous and unfit character and disposition were well known to defendant; that on and previous to said first day of February, 1911, plaintiff was engaged in business in the city of Edwardsville, Illinois; that a dispute having arisen between plaintiff and defendant's servant and said Joiner, because plaintiff refused to sign a receipt of a consignment of fruit delivered to him by the defendant, that said Harry Joiner upon February first, 1911, telephoned to plaintiff to come to the office of defendant in the city of Edwardsville; plaintiff, in response to said request, started to said office and when near there was intercepted by said Joiner, who demanded that plaintiff immediately sign a receipt for the said consignment of fruit; that plaintiff, under protest, started to sign said receipt, and while he was so engaged, the said Joiner, the agent and servant of said defendant, acting within the scope of his employment as such agent and servant, did suddenly and without warning give way to a fit of passion and draw a pistol and without just cause or provocation wantonly, wilfully, maliciously and unlawfully shoot plaintiff twice, wounding him in and about the left breast and left shoulder.

"Plaintiff states that as a direct result of said injuries and assault he suffered great bodily and mental pain and was confined to a hospital by reason thereof for a long period of time, to-wit, for the period of about one month, and thereafter was confined at his home to his bed and room for the period of about one

month; that by reason of said injuries he was disabled and prevented from attending to his business and affairs for the space of about seven months; that he suffered and will continue to suffer great bodily pain, annoyance, inconvenience and expense; that as a direct result of said injuries and assault he was compelled to procure and did procure necessary medical attention and service and treatment, which were then necessary and still are and will continue to be necessary for an indefinite period, and that on account of said services alone he has been put to the expense of about the sum of three hundred dollars.

"Plaintiff states that by virtue of the premises he has been injured and damaged in body, mind, health, pain and suffering and loss of time and necessary expenses in the sum of ten thousand dollars actual damages and ten thousand dollars punitive damages, for both of which amounts, together with the costs in this behalf expended, plaintiff prays judgment."

On October 21, 1912, respondent filed a demurrer to each count of said amended petition, which said demurrer without caption and signature, reads as follows:

"1. Now comes defendant and demurs to the first count of the plaintiff's amended petition on the ground that said count of said amended petition does not state facts sufficient to constitute a cause of action.

"2. And defendant comes and demurs to the second count of plaintiff's amended petition on the ground that said count of the said amended petition does not state facts sufficient to constitute a cause of action."

At the December term, 1912, and on January 3, 1913, of said term, demurrer aforesaid was sustained. On January 31, 1913, during said term, plaintiff declined to plead further and final judgment was rendered on said date, and the cause was duly appealed to this court.

I.  Does the first count of the amended petition contain facts, sufficient at law, to constitute a cause of action against defendant?

Turning to the amended petition, and analyzing same, we find that in substance it alleges the following facts: (1)  That defendant is a corporation, organized under the laws of Illinois, and doing business in the State of Missouri; (2) that on or about February 1, 1911, defendant was engaged in the express business as a common carrier of freight; (3)  that it had and maintained an office in the city of Edwardsville, Illinois; (4)  that said *office* was in charge of one Harry Joiner, *who was at the time agent and servant of defendant*; (5)  that defendant was at said time a merchant in said city of Edwardsville;  (6) that several days prior to February 1, 1911, defendant in its capacity as a common carrier, delivered to plaintiff a consignment of fruit, and the latter refused to sign a receipt therefor, until said Harry Joiner the agent and servant of defendant aforesaid, had agreed to present plaintiff's claim for a shortage allowance in the consignment;  (7)  that upon said first day of February, 1911, *said Harry Joiner, defendant's agent and servant, telephoned plaintiff to come to the office of defendant for the purpose of discussing a settle-ment of the matter;*  (8)  *that in response to said message plaintiff started to defendant's office as requested by defendant's servant;* (9)  *that near the office plaintiff met defendant's servant, the said Joiner, who demanded that plaintiff then and there sign a receipt for the said consignment of fruit;* (10)  th'at plaintiff *under protest* started to comply with said demand *and was in the very act of signing the receipt,* when said Harry Joiner, being at the time an em-

*Liability of Corporation for Murderous Assault of Agent.*

266Mo.41

ployee, agent and servant of defendant, and acting within the scope of his employment as such agent and servant, did suddenly and without warning draw a pistol, and without just cause or provocation, wantonly, maliciously and unlawfully shoot plaintiff twice, wounding him in the breast and shoulder, etc.

A demurrer to each count of said petition was sustained by the trial court, upon the theory, that neither count states facts sufficient to constitute a cause of action.

Defendant strenuously insists that the words, "within the scope of his employment," is an allegation of a legal conclusion. The above language taken *alone,* without any reference to that which precedes or follows it, would state simply a legal conclusion, and the truth of same would not be admitted by a demurrer thereto. [State ex rel. v. Railroad, 240 Mo. 35, l. c. 49-50; Gibson v. Railroad, 225 Mo. 473, 482; Shohoney v. Railroad, 223 Mo. 649, 671; Mallinckrodt Chemical Works v. Nemnich, 169 Mo. l. c. 397; Sidway v. Land & L. S. Co., 163 Mo. l. c. 374-5; Clark v. Dillon, 97 N. Y. 370; Snyder v. Railroad, 60 Mo. l. c. 419; Southern Ry. Co. v. King, 217 U. S. l. c. 536-7; General Electric Co. v. El. & Mfg. Co., 144 Fed. 458; Railroad v. Lightheiser, 163 Ind. 247; Fremont, E. & M. V. R. Co. v. Hagblad, 72 Neb. 773; Kennedy v. Street Ry. Co., 72 N. J. L. 19; Bullock v. Butler Exchange Co., 22 R. I. 105.] Numerous other cases can be found in practically every State of our Union announcing the same principle, *but we have been unable to locate any case, which would warrant the court, in passing upon the above question, to ignore the well pleaded facts upon which the conclusion of law was based.* In other words, if the *facts* stated, aside from the language above quoted, are sufficient to stamp the acts and conduct of Joiner, at the time and place of shooting, as being within the scope of his employment, then the petition states a

good cause of action, even if the language *"within the, scope of his employment"* be eliminated therefrom. Cases of this character present a mixed question of law and fact. It is a common, but an appropriate form of pleading, in cases like the one at bar, to set out the the facts constituting the cause of action, and follow the same with the allegation that the agent at the time of the assault was acting within the scope of his employment. The demurrer goes to the count as a *whole,* and should not be determined upon isolated and disconnected portions of the petition.

As said in Snyder v. Railroad, 60 Mo. 1. c. 419, cited and relied upon by defendant: ''The *facts* being conceded, whether a given act is within the scope of a servant's employment is a question of law for the court.''

It appears from the petition that defendant was a corporation, a merchant, and likewise engaged in carrying on an express business, in the town aforesaid, as a common carrier of freight. It is also averred that defendant maintained an office in Edwardsville, Illinois, and that said Harry Joiner was the agent and servant of defendant, in charge of said office.

It appears from the petition that defendant as a common carrier, had delivered to plaintiff a consignment of fruit, and on account of the shortage of same plaintiff declined to receipt for said fruit unless Joiner, the agent, would present plaintiff's claim for an allowance on account of said shortage. While matters were in this shape, the agent, Joiner, called up plaintiff by telephone, and requested him to come to defendant's office for the purpose of discussing a settlement of the matter. In response to said message, plaintiff started to defendant's office as requested, and when near the office plaintiff met Joiner. The latter *demanded* that plaintiff *then* and *there* sign a receipt for the said consignment of fruit. Up to and including above, Harry Joiner was the unquestioned

agent of defendant, and was acting within the scope of his employment in endeavoring to obtain from plaintiff a receipt for said consignment, and a settlement of the controversy in respect to said shortage. It is insisted, however, by respondent, that Joiner was not acting within the scope of his employment when he *shot* plaintiff at the time and place mentioned in the complaint. The petition, however, alleges, that plaintiff, *under protest*, started to comply with Joiner's demand and was in the *very act* of signing the receipt when Joiner, being at the time the agent of defendant, and acting within the scope of his employment, as such agent, did suddenly and without warning draw a pistol, and without just cause or provocation wantonly, maliciously and unlawfully shoot plaintiff, etc.

Joiner was there at the time and place of shooting as the *vice-principal* of defendant. The plaintiff was there upon the *invitation* of defendant for a *legitimate* purpose. He and Joiner were in the midst of the very business which had called them together, at the time said shooting occurred. In addition thereto, the petition alleges that plaintiff was in the *very act* of signing the receipt when he was suddenly shot, etc.

A large portion of the business of this country is conducted through agents of common carriers; and in a large measure, the public is required to come in contact with these agents in dealing with public service corporations. Upon grounds of public policy, if for no other reason, the *principal* should not be permitted to withdraw from the business and turn the same over to agents who have no regard for the public welfare, and thereby escape responsibility which he would have to bear, if attending to the business in person.

It is not imposing too great a hardship upon either corporations or individuals, to require them to respond in damages to legitimate patrons, for unprovoked, wanton and malicious assaults, inflicted

upon them, while in the very act of settling their controversies with the agent of the carrier. The conclusion thus reached is fully sustained by the great weight of modern jurisprudence. [Whiteaker v. C. R. I. & P. R. R. Co., 252 Mo. 438; O'Malley v. Construction Co., 255 Mo. l. c. 391-2; Winn v. Railroad, 245 Mo. l. c. 415-6; Haehl v. Railroad, 119 Mo. 325; Perkins v. Railroad, 55 Mo. 201, 214; Garretzen v. Duenckel, 50 Mo. 104; Whimster v. Holmes, 177 Mo. App. 130; 5 Thompson on Corporations (1 Ed.), sec. 6298; Richberger v. Express Co., 73 Miss. 161; Railroad v. Hackett, 58 Ark. l. c. 387; Tillar v. Reynolds, 96 Ark. 358; Skipper v. Clifton Mfg. Co., 58 S. C. 143; Stranahan Co. v. Coit, 55 Ohio St. 398; Carlberg v. House Furnishing Co., 178 Ill. App. 424; Ziegenhein v. Smith, 116 Ill. App. l. c. 82; D. & R. G. Ry. v. Harris, 122 U. S. 597; Lake Shore & M. S. Ry. Co. v. Prentice, 147 U. S. 101, 109; Forrester v. So. Pac. Ry. Co., 36 Nev. 247; 2 Cooley on Torts (3 Ed.), secs. 627, 631, 632; Wood's Law of Master & Servant (2 Ed.), secs. 307-309; 1 Shearman & Redfield on Negligence (6 Ed., by Street), sec. 146, p. 356; Pierce on Railroads, pp. 277-8; 2 Mechem on Agency (2 Ed.), secs. 1929-1960; 1 Clark & Skyles on Law of Agency, secs. 491, 493, 494, 502; Leavitt's Law of Negligence, pp. 527-8; Otis Elevator Co. v. First Nat. Bank, 163 Cal. 31; Ryder v. City of La Grande, 73 Ore. 227; Hardeman v. Williams, 169 Ala. 50.] Many other cases are cited in above authorities to same effect. A few quotations will illustrate the trend of the modern rule in dealing with this subject.

Haehl v. Wabash Ry. Co., 119 Mo. 325, has not only become one of the leading cases in this State upon the question under consideration, but has been frequently cited with approval in text books and opinions of other States. In the Haehl case, suit was brought by plaintiff to recover damages, on account of the killing of

her husband, by defendant's watchman in charge of its bridge across the Missouri river at St. Charles, Missouri, in March, 1891. She recovered in the trial court a judgment for $5000, and it was affirmed by the Supreme Court. The bridge in charge of said watch-man was a railroad bridge, and not a public highway for foot passengers. At about eight o'clock in the forenoon of March 17, 1891, deceased was seen crossing above the bridge from the St. Louis county side towards St. Charles on the west. He had gone over the approach on the St. Louis side, the main bridge and a part of the approach on the St. Charles side, when he was met by James W. Hill, defendant's bridge watchman, and his brother. The watchman motioned to him to go back, but the latter failed to do so. Hill went up to him and had some conversation with him, but no witness heard it. "It resulted, however, in the deceased starting back, when Hill struck him on the back or shoulder twice with a club or billy, and the deceased commenced running back towards the St. Louis side, followed by Hill. They thus proceeded until the deceased had recrossed the trestle on the St. Charles side, the whole of the main bridge, and about one-half the approach on the St. Louis side, pursued by Hill, when they two being thus alone on that approach, Hill in the rear of deceased and distant about fifteen feet from and pursuing him, a pistol shot was fired, the ball striking the deceased in the back of the neck a little to the left of the median line and on a line with the base of the ears," producing his death.

With the above facts before it, this court sustained the judgment below, although the jurors in arriving at their verdict were authorized, if they found for plaintiff, to allow both compensatory and exemplary damages.

In the Haehl case, *supra*, the deceased was not lawfully upon the bridge and was retreating when shot.

Here, the plaintiff was not a trespasser, but was transacting his, and the company's business, with the defendant's agent, upon invitation, and while in the very act of complying with the agent's request was shot without warning and without provocation.

In Richberger v. Express Co., 73 Miss. 161, the trial court sustained a remurrer to a petition very similar to the one at bar, and its action in that respect was reversed by the Supreme Court and said petition held to be good. In the above case, plaintiff had been made to pay an overcharge on express matter by the local agent of defendant, and the general agent had been seen and said it would be arranged. Plaintiff saw the local agent about December 25, 1894, but was put off. The petition avers that about the first day of January, 1895, plaintiff went to the office of said express company, upon business with it. Said agent of defendant in charge of the office informed plaintiff that he then and there desired to refund to plaintiff said overcharge, "and then and there paid the same to plaintiff, and required plaintiff to sign a receipt for the same, and when plaintiff signed and delivered said receipt to said agent, the said agent did then and there, immediately upon the reception of said receipt, and while plaintiff was there in the business office of said company, wilfully, wantonly, oppressively and wrongfully curse, abuse, insult and maltreat plaintiff, because plaintiff had demanded and received from said company the overcharge as aforesaid." Judge WHITFIELD, upon pages 171-2, closed his opinion in the case just cited, with a quotation from the very able opinion of Judge ANDREWS of the New York Court of Appeals, in Rounds v. Railroad, 64 N. Y. l. c. 134, as follows:

"The master who puts the servant in a place of trust or responsibility, or commits to him the management of his business or care of his property, is

justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper, or *under the influence of passion aroused by the circumstances and the occasion,* goes beyond the strict line of his duty and authority and inflicts an unjustifiable injury upon another.''

In the well considered case of Otis Elevator Co. v. First Nat. Bank, 163 Cal. l. c. 39, Judge LORIGAN, speaking for said court, said:

''It is the general doctrine of the law, as it is our statutory rule, that a principal is liable to third parties not only for the negligence of its agent in the transaction of the business of the agency, but likewise for the frauds, torts or other wrongful acts committed by such agent in and as part of the transaction of such business. [Story on Agency, sec. 452; Shearman & Redfield on Negligence, sec. 65; Civ. Code, sec. 2338.] After declaring this to be the rule, Story says: 'In all such cases the rule applies, *respondeat superior;* and it is founded upon public policy and convenience; for in no other way could there be any safety to third parties in dealings either directly with the principal or indirectly through the instrumentality of agents. In every such case the principal holds out the agent as competent and fitted to be trusted; and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of his agency.' ''

In Pierce on Railroads, at pages 277-8, the rule is tersely stated as follows:

''The company is liable for the acts of its servants in the course of their employment, both in the rightful use and in the abuse of the powers conferred upon them; and when they keep within the course of their employment, it is responsible for their negligence or wrongful act, although they are acting against its instructions, or even wilfully.''

In 2 Cooley on Torts (3 Ed.), section 626, page 1017, the greatest of all writers upon this subject, in clear and forceful language, said:

"The master is liable for the acts of his servant, not only when they are directed by him, but also when the scope of his employment or trust is such that he has been left at liberty to do, while pursuing or attempting to discharge it, the injurious act complained of. It is not merely for the wrongful acts he was directed to do, but the wrongful acts he was suffered to do, that the master must respond."

In 2 Mechem on Agency (2 Ed.), section 1929, the same principle of law is clearly expressed in the following language:

"It is obvious, therefore, that the question of the principal's or master's liability cannot always be determined merely by putting a label upon the motive. The motive is important, but it is important not so much for the purpose of determining how the act was done as to aid in deciding whose act it was. Certain it is, at any rate, that the tendency of the modern cases is to attach less importance to the motive with which the act was done, and to give more attention to the question as to whose business was being done and whose general purposes were being promoted."

The same author, in the same volume, under section 1960, page 1523, sums up the law upon this subject as follows:

"In many cases no better definition can be given than the words themselves suggest. But, in general terms, it may be said that an act is within the course of the employment if (1) it be something fairly and naturally incident to the business, and if (2) it be done while the servant was engaged upon the master's business and be done, although mistakenly or ill-advisedly, with a view to further the master's interests, or from some impulse or emotion which naturally grew

out of or was incident to the attempt to perform the master's business, and did not arise wholly from some external, independent and personal motive on the part of the servant to do the act upon his own account.''

We deem it unnecessary to quote further from the authorities upon this subject. The rule declared in the Haehl case supra, is in full accord with the recent utterances of this court, and is sustained by the decided weight of authority. We therefore hold that the first count of the petition states a good cause of action, and that the demurrer thereto was improperly sustained.

II. The second count of the petition sets out in a general way substantially the same facts pleaded in the first count, and in addition thereto attempts to plead *knowledge* upon the part of defendant as to the temper, disposition, character and unfitness of its agent who assaulted plaintiff. While it does not appear from the petition that such knowledge came to defendant, in time by the exercise of ordinary care to have removed said agent before the assault was made, yet the other facts stated in said count, under the authorities heretofore cited, are sufficient to constitute a good cause of action. Hence the demurrer to the second count was improperly sustained.

III. We have reached the conclusion, that each count of the petition states a good cause of action.

We therefore reverse and remand the case as to both counts, with directions to the trial court to set aside the judgment rendered upon each of said counts; to grant the plaintiff a new trial as to each count and that the cause be proceeded with in accordance with the views herein expressed. *Brown, C.,* not sitting.

PER CURIAM.—The foregoing opinion by RAILEY, C., is adopted as the opinion of the Court in Banc. *Graves* and *Bond, JJ.,* concur; *Faris* and *Revelle, JJ.,* concur in result; *Woodson, C. J.,* dissents in separate

opinion, in which *Blair, J.,* concurs; *Walker, J.,* dissents.

WOODSON, C. J. (dissenting):—I dissent from the majority opinion in this case, principally for the reasons stated by me in the dissenting opinion filed in the case of Whiteaker v. Railroad, 252 Mo. 438, l. c. 463; also for the reason that it is absurd, to my mind, to say that public service corporations of the country in employing men to conduct their business thereby authorize them to commit murder or other felonies, which constitute no part of the acts performed by them as such agents. No such idea ever enters the minds of the carrier, their employees or any of their customers; consequently, it is a *non sequitur* to say that such an agent or employee as Joiner, in this case, was acting within the scope of his employment when committing the crime with which the petition charges him—one of the most heinous known to God and man. In other words, no such corporation could, by express authority, authorize one of its employees to commit a crime in the performance of his duty to the company, unless he was acting within the scope of his employment. If such authority should be given, it would clearly be *ultra vires,* and not binding on the company; but should the officers of the company direct the agent to commit a crime and he should perpetrate it, then he and they would be *particeps criminis* in its commission, which, in no manner, could or would render the company liable to the injured party in damages; consequently, in order to render the company liable in such a case, the agent must be acting within the scope of his employment, that is, the crime committed must have been a part of or an integral element of the act he performed for the company under its contract with him authorizing him to perform the same; and in such a case it is wholly immaterial whether his authority to commit the crime was given in express terms or im-

plied from the authority to perform the act of which the crime was a part. This is self-evident.

That being true, then let us for a moment briefly consider what services or acts the agent was employed to perform for the defendant. While the petition does not state them in detail, yet in general terms it charges that he was the agent of the company at Edwardsville, Illinois, and that it was his duty to deliver to its patrons all goods transported by it to them at that point, and to take their receipts therefor.

It is also charged that the goods which the company had transported to plaintiff at Edwardsville, had been delivered to him by the agent —— days prior to the day upon which the shooting occurred.

From this statement in the petition it is clearly seen that the act of *delivering* the *goods* in no manner caused or contributed to the injury; that service had been fully performed long before the shooting occurred. So this fact will be dismissed without further consideration.

Consequently, if the company is liable to plaintiff, it must be for the reason that it authorized the agent to use violence if necessary toward the plaintiff in the performance of the service of the company in procuring the receipt for the goods delivered to him.

There is no charge in the petition that the defendant had given the agent express authority to commit the assault upon the plaintiff, and, therefore, if the agent possessed that authority, it must be implied from the general authority given by the defendant to all of the agents, the plaintiff included, to take receipts from its patrons for goods transported for and delivered to them. So it is seen that the question has been narrowed down to the single legal proposition, was the crime committed by the agent, a part of, or an integral element of the act of the agent in demanding the receipt of the plaintiff for the goods previously delivered to him?

That question, in my opinion, must be answered in the negative. The authority of the agent to demand and receive the receipt in no manner required the exercise of any force or violence on his part toward the plaintiff, nor is such a thing contemplated by any one in the performance of such a duty; and if procured by violence, the receipt would be worthless for the purpose for which the company wanted it, namely, as evidence of the delivery of the goods. Its procurement by that means would amount to duress or robbery, which would render the receipt illegal and destroy it as evidence of the delivery, the design of the company in demanding it.

Clearly the case of Haehl v. Wabash Ry. Co., 119 Mo. 325, does not support the propositions of law announced by our learned commissioner in this case. In that case the performance of the act of the agent for the defendant, which resulted in the death of Haehl, was authorized by the company, and from the very nature of that act, force or violence was contemplated, if necessary, for its performance. There the agent was a watchman, and among other things he was required to keep trespassers off of defendant's bridge, and while expelling Haehl therefrom the latter was killed by the agent. In discussing that case, the court on page 340, said:

"It is conceded that a part of the business which Hill was employed to perform as watchman, was to keep trespassers off of defendant's bridge; this necessarily involved the duty of putting them off after they got on, if they were found unwilling to go. The evidence tended to show that Hill was engaged in the performance of this duty when he fired the fatal shot; that the business was not done; that it was not taking care of itself, but that the defendant's servant at the time was engaged in it and concerned about it; that he shot *dum fervet opus;* and so far as evidence discloses, was concerned about, and engaged in, no other business."

In the case at bar, the duty of the agent to demand the receipt from the plaintiff did not involve the duty of using force or violence toward him. Nor does the case of Whiteaker v. Ry. Co., 252 Mo. 438, lend any support to the opinion of the commissioner. In that case it was the duty of the conductor of the train to keep trespassers off of it. There the court held, as in the former case, that the act of expelling persons from the train necessarily implied the authority to expel them therefrom by force, if necessary, and that if more force was used than was necessary to accomplish his ejection, and he was thereby injured, then the company was liable. I dissented from the opinion in the latter case, not because it did not announce correct legal propositions, but for the reason that there was not sufficient evidence upon which to base them, as will appear by the dissenting opinion filed therein.

But in both of those cases, this court clearly recognizes the principles of law I am here contending for. In the first case this court on page 339, said:

"But if his [the master's] business is done, or is taking care of itself, and his servant not being engaged in it, not concerned about it, but impelled by motives that are wholly personal to himself and simply to gratify his own feeling of resentment, whether provoked or unprovoked, commits an assault upon another, when that has and can have no tendency to promote any purpose in which the principal is interested and to promote which the servant was employed, then the wrong is the purely personal wrong of the servant for which he and he alone is responsible."

The case of Rounds v. Railroad, 64 N. Y. 129, is one of the best considered cases in this country upon the subject, and clearly supports the views I have here expressed. At page 136, Judge ANDREWS puts the matter clearly:

"If he [the servant] is authorized to use force against another when necessary in executing his mas-

ter's orders, the master commits it to him to decide what degree of force he shall use; and if through misjudgment or violence of temper he goes beyond the necessity of the occasion and gives a right of action to another, he cannot as to third persons be said to have been acting without the line of his duty or to have departed from his master's business. If, however, the servant, under the guise and cover of executing his master's orders and exercising the authority conferred upon him, wilfully and designedly for the purpose of accomplishing his own independent, malicious or wicked purposes, does an injury to another, then the master is not liable. The relation of master and serant as to that transaction does not exist between them. It is a wilful and wanton wrong and trespass, for which the master cannot be held responsible. And when it is said that the master is not responsible for the wilful wrong of the servant, the language is to be understood as referring to an act of positive and designed injury, not done with a view to the master's service or for the purpose of executing his orders.''

At page 137: ''It is conceded that the removal of the plaintiff from the car was within the scope of the authority conferred upon the baggageman. . . . But the court could not say from the evidence that the brakeman [baggageman] was acting outside of and without regard to his employment or designed to do the injury which resulted, or that the act was wilful within the rule we have stated.''

In the case of Pendleton v. Kinsley, 3 Cliff. 416, Fed. Case No. 10922, Judge CLIFFORD said: ''The moment the passenger enters the steamer or other conveyance he is more or less under the control of the master or conductor and subject to their orders. Fit or unfit, humane or brutal, good-tempered or morose, the passenger is comparatively helpless and may be obliged to submit for the time without any means of redress.''

In the case at bar, as stated by counsel for respondent: ''The assault upon appellant was not committed upon the premises of the respondent, but appellant assaulted him upon the public highway near the premises of the respondent, and after being intercepted by respondent's agent while he was on the way to respondent's office in response to a telephone message from the respondent's agent requesting him to come to the office. Plaintiff was not under the 'control' of defendant or any of its agents and so 'helpless and obliged to submit without any means of redress' within the reason of the rule.''

Where the reason for the rule stated by Judge CLIFFORD fails, the rule fails also, and therefore, the defendant was not the insurer of the safety of the plaintiff against assaults made by its agents, except when acting within the scope of their employment.

Thompson on Corporations (1 Ed.), in section 6298 states: That the old rule that the master was in no case liable for the wilful or malicious act committed by the servant is unsound. In section 6299, entitled ''The True Test Suggested,'' he says: ''The modern rule is, that if a servant, authorized to use force about his master's business, uses excessive force, his master must answer in damages to the person thereby injured, wholly without reference to the state of mind under which the servant acted. If he is required to use force, and is left to his discretion as to how much he shall use, the master will, upon either view of the subject [i. e., whether with or without malice], be answerable if he uses too much force through negligence.''

In section 6300 he says: ''It must now be conceded as a modern rule that the mere fact that the wrong complained of was wilful or malicious, or that in doing it the state of mind of the actor was really that which is characterized by the use of the words 'malice,' 'hatred' or 'ill-will,' does not exonerate the corporation from liability. But on the other hand,

this very state of mind of the actor may be relevant evidence, and in some cases of the most cogent nature, to show that when he did the act he was not acting for the corporation. . . . The actor may be the agent, and even a principal officer of the corporation, and he may even at the time of doing the wrongful act be intending to serve the corporation, and yet the act may be of such a character so extraordinary as to defeat any presumption that is could possibly be authorized by the corporation. . . . Assuming in such cases that there is authority to use force in case of resistance or non-compliance with orders, may not the force used be so extreme—may not the weapon employed be so unusual—as entirely to defeat this presumption of authority?''

In Richberger v. Express Co., 73 Miss. 161, the court, at page 171, refers with approval to Rounds v. Delaware, Etc. R. R. Co., 64 N. Y. 1. c. 136, quoted in Railroad v. Latham, 72 Miss. 32, to show when in this character of case the corporation would not be liable, and quotes at the end of the opinion from Rounds v. Delaware, Etc. R. R. Co., to show when liability exists.

Next consider 2 Cooley on Torts (3 Ed.—Lewis), sections 627, 631, 632. In section 627: ''But the liability of the master for intentional acts which constitute legal wrongs can only arise when that which is done is within the real or apparent scope of the master's business. It does not arise where the servant has stepped aside from his employment to commit a tort which the master neither directed in fact, nor could be supposed from the nature of his employment to have authorized or expected the servant to do.''

Judge COOLEY, for the Supreme Bench of Michigan, in a case of a boy, the servant of defendant, driving over plaintiff, approved an instruction that ''if the boy 'drove in a careless and reckless manner, he would be acting within the scope of his master's employment;

266Mo.42

but that if he wantonly, wilfully and intentionally ran over the plaintiff, he would not be acting within the scope of his master's authority. But if he carelessly, unintentionally and accidentally ran over the plaintiff, then the plaintiff should recover.'" "This instruction" (says Judge COOLEY) "was all the defendant could reasonably ask. It stated the law correctly and fairly. If it was a case of intentional injury, defendant was not responsible." [Cleveland v. Newsom, 45 Mich. 62.] This opinion of Judge COOLEY's was approved and declared to be the law of Michigan in 1911 in the case of Ducre v. Sparrow-Kroll Lumber Co., 168 Mich. 49, opinion by McALVAY, a case where a salesman wantonly and wilfully beat with a hammer a drunken person who came into the store. "It was a wanton, wilfull and intentional injury committed without regard to consequences and within a narrow margin of having resulted in the crime of manslaughter. Under the circumstances presented by this record, such an act cannot be held to have been committed by this man while in the performance of his duties for defendant within the scope of his employment; and our conclusion is that, as a matter of law, no liability attached to the appellant." [Ducre ·v. Lumber Co., supra.]

Woods' Law of Master and Servant (2 Ed.), sections 307-309.—In section 307 it is said: "The simple test is whether they were acts within the scope of his employment; not whether they were done while prosecuting the master's business; but, whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him."

In section 309, at page 585, it is said: "He must have been authorized, either expressly or impliedly, to do the act in some manner, which he has improperly or wrongfully performed, and the fact that he was

only authorized to do the act in a certain way does not save the master from liability.''

At page 586 it is said: ''The rule may be stated thus: For a wilful and malicious trespass of a servant, not commanded or ratified by the master, but perpetrated to gratify the private malice of the servant under mere color of discharging the duty which he has undertaken for his master, no action will lie against the master. But if the act of the servant was necessary to accomplish the purpose of his employment and was intended for that purpose, however ill-advised or improper, then it was implied in the employment, and the master is liable, though the servant may have executed it wilfully and maliciously.''

In Shearman & Redfield on Negligence (6 Ed., by Street), sec. 146, p. 356, it is again said the master is liable for the acts of his servant in the course of the servant's employment. In section 148 it is said: ''The fact that the servant was at the time of the injury engaged in the service of his master is not conclusive of the master's liability. . . . The act complained of must be within the scope of authority which the agent had from the master, or which the master gave the servant reasonable cause to believe that he had or which servants employed in the same capacity usually have or which third persons have a right to infer from the nature and the circumstances of the employment.''

In Clark & Skyles, on Law of Agency, sections 491, 493, 494, 502, are cited. In section 502, concerning assault and battery by agent, it is said: ''In accordance with the principles heretofore considered a principal may be held liable for an assault committed by his agent in the course of his employment and for the purpose of advancing the principal's interests. Hence, in cases where an agent is authorized to use force against another in order to carry out his principal's orders, the principal commits it to the agent to decide what degree of force he shall use,'' and the prin-

cipal is held liable for excessive force of wanton assaults. "If . . . the agent . . . ., where he is not authorized to use force at all, wilfully and designedly, for the purpose of accomplishing his own independent, malicious and wicked purposes, does an injury to another as by assaulting him, the principal is not liable therefor."

All such men should stand before the courts and jurors of their country in the nakedness of their crime, unveiled with the cloak of *apparent* authority from their employer, who never dreamed of such depravity, and receive the just punishment the law wisely prescribes for them. They are nothing but criminals disguised in sheep's clothing.

But it is said, what will become of the innocent and injured public *who* suffer at their hands? Answer: What becomes of the innocent and injured public *who* suffer at the hands of all criminals, regardless of their avocation in life? All such criminals should be swiftly tried and speedily punished for their violation of the law, regardless of the badge they wear, whether that of an individual, an agent or an officer of the law; and in my opinion, those who commit crime under the guise of real or apparent authority are more guilty than the individual who acts upon his own initiative and responsibility, for the latter knows that he must alone meet the charge and suffer the consequences thereof, whereas the former cowardly shield themselves behind their cloak of real or apparent authority to reek their hellish designs upon others.

The score and a half or more authorities cited in the majority opinion in support of companies' liability, as well as the many more that might be cited, show to what extent this subterfuge has been resorted to as a cloak under which to commit wrong, knowing or supposing that the company, prompted by its financial interests, will defend the civil side of all such civil actions, and thereby at the same time extract from the

crime the poisonous malignity which prompted it, and thereby stay criminal prosecution.

In my opinion, it would be for the better public policy to let all such criminals know that they, and they alone, must personally stand responsible for such crimes; and at the same time give full force and effect to the letter and spirit of the contract of employment, namely, that the agent is to transact the business of the employer in an efficient, prudent and careful manner, and not to commit crime against God and man under the cloak of its authority.

The law is and always has been that where the principal exercises ordinary care and prudence in the selection of an employee, he is not liable to a fellow employee because of injury inflicted in consequence of the unskillfulness of the former. That being true, then how much stronger is the reason for the law which universally holds that no person is liable for the crime of another without he is a party to it or a conspirator in its commission?

In the case at bar there is no evidence tending to show that the respondent employed Joiner to commit the crime charged in the petition, or that it was necessary for him to commit it in asking for the receipt, nor that the respondent conspired with him or knew of its commission until long thereafter.

Public service corporations must, because of the very nature of their business, conduct the same through numerous agents and the law presumes that they are men of good character and law abiding; and never presumes that any one will commit crime, and under that presumption it does seem to me that it is a harsh and unjust rule which holds such a company liable for the crime of one of its agents, the commission of which was not contemplated, necessary or within the scope of his employment, expressed or implied, but was wholly beyond the legal bounds of *contractual*

*liability*. If liable, it is because the company was a party to the crime, of which there is no evidence.

Of course, had Joiner injured the appellant while acting within the scope of his employment, the company should be held strictly liable, but not otherwise.

I am therefore of the opinion that the judgment of the circuit court should be affirmed. *Blair, J.,* concurs.