# PETER KIBBLE v. QUINCY, OMAHA & KANSAS CITY RAILROAD COMPANY, Appellant.

### Division One, December 30, 1920.

1. **NEGLIGENCE: Instruction: Knowledge of Peril: Inference.** The fireman told the engineer, when the train was some distance from a railroad crossing, that he could not get his injector to work, to which the engineer replied, "All right; I will put mine on, and when we get to the crossing you get down and fix it, and I will wait for you." When the train stopped at the crossing, the fireman got down, but the evidence does not show that the engineer had actual knowledge that he had done so, and owing to their relative positions he could not have seen the fireman leave the cab. *Held*, that the jury could have found that the engineer, in the exercise of ordinary care, would not have forgotten the directions he had given the fireman and would have ascertained whether the fireman had followed his instructions before starting the train; and it was not error, therefore, to submit to the jury for determination whether the "fireman, while in the performance of his duties and acting under the instructions of the engineer, got upon the ground for the purpose of working upon the injector, and whether, while he was so engaged, the engineer, knowing, or in the exercise of ordinary care should have known, that the fireman was upon the ground in a position likely to be injured by moving said engine, and carelessly and negligently started said engine without giving the fireman any warning of his intention so to do.'

2. ———: ———: ———: **Within Scope of Pleading.** Where the petition charged that the defendant, "through its engineer carelessly and negligently started said engine without warning the plaintiff," an instruction telling the jury that, "if the engineer, knowing or in the exercise of ordinary care should have known that plaintiff was on the ground in a position likely to be injured by moving said train, and carelessly and negligently started said engine without giving plaintiff any warning of his intention to do so," etc., was clearly within the scope of the pleadings.

3. ———: ———: **Warning of Starting Train: Whistling Signal.** Where the engineer had told the fireman to get down and fix his injector when the train reached a railroad crossing and that "I will wait for you," and the fireman got down and went to work on the injector, a whistling signal indicating that the crossing was clear was not a warning that the engine was about to start.

4. ———: ———: **Measure of Damages: Permanent Injuries.** Evidence that plaintiff's right foot and ankle were crushed, necessitating an amputation; that the leg has not healed; that drainage tubes had been inserted in the wound and through these pus and particles of bone are being thrown off; that plaintiff is thirty-two years of age, had been working as a locomotive fireman for eight or nine years, and earning at the time of his injury $125 per month, is a sufficient basis for an instruction telling the jury that they should "take into consideration plaintiff's future suffering and future loss of earnings."

5. ———: ———: **Harmless Testimony.** It is not reversible error to refuse an instruction for appellant directing the jury to disregard certain testimony which went in without objection and which, whether competent or incompetent, could not have injuriously affected appellant.

6. ———: **Evidence: Contrary to Physical Facts: Arbitrary Deductions: Directed Verdict.** When established physical facts and common observation and experience conflict with the testimony of witnesses, such testimony does not amount to substantial evidence of the alleged facts testified to and cannot be accepted as the basis of a verdict and judgment. But so frequently do unlooked-for results attend the meeting of inter-acting forces that courts should not indulge in arbitrary deductions from physical law and fact, except when they appear to be so clear and irrefutable that no room is left for the entertainment by reasonable minds of any other conclusion. And in this case, while plaintiff's testimony as to the position of his right foot being "clear down on the ground" under his body at the same time he placed it upon the step two feet above is so in conflict with common experience and observation as to be incredible, yet it only affected his credibility as a witness, and under the other circumstances it cannot be said that the jury was

not warranted in finding that his injury was proximately caused by the negligent starting of the train.

7. **EXCESSIVE VERDICT**: $20,000: Loss of Leg. Where the only permanent injury is the loss of a limb an award of damages in excess of ten thousand dollars, according to a long line of decisions, will not be allowed to stand.

Appeal from Daviess Circuit Court.—*Hon. Arch B. Davis,* Judge.

AFFIRMED (*on condition*).

*H.. J. Nelson* and *J. G. Trimble* for appellant.

(1) The court should have given the peremptory instruction to find for defendant asked at the close of all the evidence in the case for the reason that plaintiff had utterly failed to make a case either under his pleadings or the evidence. (a) In this petition plaintiff alleged two acts of negligence—in furnishing a defective locomotive and in starting the locomotive without warning. The first charge was abandoned on the trial and the second was overthrown by plaintiff's testimony in that he says he heard the warning signals as he got off the engine and yet walked 9 feet and 10 inches to the injector thereafter. Plaintiff must recover, if at all, on the specific negligence charged and proved. Haake v. Davis, 166 Mo. App. 249; Bobbitt v. United Railways, 169 Mo. App. 424. (b) The physical facts show that plaintiff's testimony as to how he received his injury is absolutely unworthy of belief. Where plaintiff's testimony is in direct contradiction of well-known physical facts and principles, his testimony will not be accepted. Davidson v. Railroad, 164 Mo. App. 701; Sexton v. St. Ry., 245 Mo. 254; Giles v. Railroad, 169 Mo. App. 24; Phillips v. Railroad, 170 Mo. App. 416; Yonkers v. Railroad, 182 Mo. App. 558; Fagg v. Railroad, 185 Mo. App. 79; Landrum v. Railroad, 178 S. W. 273; Guffey v. Harvey, 179 S. W. 729; Schaub v. Ry., 133 Mo. App. 444; Gessner v. St.

Ry., 137 Mo. App. 47. (2) Plaintiff's instruction one was erroneous in that it submitted to the jury the question of plaintiff acting under the instruction of the engineer when no such fact was pleaded in his petition. Said instruction was erroneous in that it gave the jury a roving commission to speculate on whether the engineer "should have known" plaintiff was on the ground. It was also erroneous in submitting to the jury the question of whether the engineer started the engine without warning, when the evidence shows warning was given and heard by plaintiff when he was in a place of perfect safety. (a) Instructions should be within the pleadings and also within the evidence. It is error to give an instruction on a theory not made in the petition or on one which there is no evidence to support. Hufft v. Railroad, 222 Mo. 286; Moellman v. Lumber Co., 134 Mo. App. 485; Degonia v. Railroad, 224 Mo. 564; Black v. St. Ry., 217 Mo. 672; Shumacher v. Breweries, 247 Mo. 141; Small v. Ice Co., 179 Mo. App. 456; Kendrick v. Harris, 171 Mo. App. 212. (b) It was error to give the instruction for the reason that it is so verbose as to be misleading and confusing. Stid v. Railroad, 236 Mo. 382. (3) It was error for the court to give instruction number four allowing the jury to find for future suffering and future loss of earnings, there being no proof of the probable future suffering or probable amount of loss or earnings. Plaintiff was not totally disabled. It is error to give an instruction on a measure of damages allowing future expenses or loss not proven in the testimony. Parris v. Crutcher, 189 Mo. App. 150; Wellman v. St. Ry., 219 Mo. 126; Modlagl v. Iron & F. Co., 248 Mo. 587; Moellman v. Lumber Co., 134 Mo. App. 485; Smith v. Railroad, 108 Mo. 251; Slaughter v. Railroad, 116 Mo. 269; Duke v. Railroad, 99 Mo. 347. (4) The court erred in refusing to give instruction D-1 for the reason that the bulletin spoken of in the evidence had nothing to do with the accident. It was not pleaded and did not

Kibble v. Q., O. & K. C. Railroad.

contribute to the accident. Therefore, it should have been taken from the jury to prevent its use, as it was used, to prejudice the jury. Houston v. Railroad, 129 Mo. App. 586; Torreyson v. United Rys., 144 Mo. App. 638; Barnes v. St. Joseph, 139 Mo. App. 545. (5) The verdict is so excessive as to permit only one conclusion, and that is that it is the result of prejudice and passion. Excessive verdicts are not allowed in this State and, when they are the result of passion and prejudice, they are not cured by *remittiturs*. Neff v. City of Cameron, 213 Mo. 350; Wellman v. St. Ry., 219 Mo. 126; Sexton v. Railroad, 245 Mo. 254; Johnson v. Brick Co., 205 S. W. 615; Brady v. Ry., 206 Mo. 509.

*J. W. McKnight* and *Mytton & Parkinson* for respondent.

(1) The defendant's contention that the whistling signals given by the engineer as the train came to a stop at the crossing were a warning to plaintiff that the train was about to proceed is absolutely and overwhelmingly refuted by the evidence. (2) The physical facts in the case corroborated and confirmed the plaintiff's evidence as to how he received his injury. Dixon v. Omaha & St. Louis Railroad, 124 Mo. 140. (3) Plaintiff's Instruction No. 1 correctly stated the law and was properly given. (4) Plaintiff's Instruction No. 4 on the measure of damages was within the averments of the plaintiff's petition, within the evidence, and likewise within the decisions of the courts. State ex rel. v. Reynolds, 257 Mo. 19; Bethel v. St. Joseph, 184 Mo. App. 388; Garner v. Kansas City Bridge Co., 194 S. W. 82; Bamber v. United Rys., 192 S. W. 953; Winterman v. United Rys., 203 S. W. 486; Sang v. St. Louis, 262 Mo. 454. (5) The verdict was not excessive. The contention that $20,000 affirmed by the trial judge, is excessive for the injuries sustained by this plaintiff, in view of the cheap value of money, must be without merit. Roeder v. Railroad, 164 N. Y. S. 167; Railroad v.

Carnahan, 118 Va. 46; Lee v. So. Pac Co., 101 Cal. 118; Hess v. St. Joseph Ry. Co., 30 Can. S. C. 218; Railroad v. Brogan, 151 S. W. 699; Bump v. Railroad, 141 N. Y. S. 1009.

RAGLAND, C.—Action for personal injuries, alleged to have been negligently caused by defendant while plaintiff was in its employ as a locomotive fireman and engaged in interstate commerce.

On the 23d day of May, 1917, the plaintiff was firing one of defendant's engines, which was hauling a mixed train of freight and passenger cars from Osborn, Missouri, to Kansas City, Missouri. When the train reached a point where defendant's road crosses the Rock Island Railroad and came to a stop, plaintiff got down out of the cab on to the ground to adjust the injector on his side of the engine. While so engaged the engine started. In attempting to get back on it, his right foot slipped off the engine step, went under the wheels and was crushed.

The petition charges the negligence as follows:

"That on said date at a point near the place where the defendant's railroad track crosses the track of the Chicago, Rock Island & Pacific Railway Company it became necessary to stop said engine for the purpose of adjusting the injector upon said engine, and after said engine was stopped, and while the plaintiff was in the work of and completing the adjusting of the same, and before he had gotten upon said engine and while he was in the performance of his duties, and working in interstate commerce, the defendant company, through its agents and servants and engineer, carelessly and negligently started said engine without warning this plaintiff, thereby causing said engine to run against, upon and over the plaintiff, then and there and thereby crushing and mangling his right foot and ankle, necessitating its amputation."

The answer is a general denial.

The accompanying picture of the engine on which-plaintiff was working at the time of his injury and which was introduced by him in evidence will help visualize the relative positions of the different parts of the engine, and the situation generally, as described by the witnesses.

The boiler extended back through the cab to the gangway between the engine and the tank. The engineer's seat was on the right and the fireman's on the left of the boiler. While occupying their respective stations in the cab they could not see each other. There were two injectors on the engine, one on the right side and one on the left. The one on the right was operated by a lever in the engineer's side of the cab; the one on the left by a similar lever in the gangway on the fireman's side. By the use of these levers the valves in the primers, through which the water flowed into the boiler, could be opened and closed. They were operated independently of each other, and the duty of keeping the water at the proper level in the boiler seems to have been left entirely to the fireman. The primer on the fireman's side was low down between the drive wheels of the engine. Sometimes this primer "stuck" so that it could not be operated with the lever in the gangway; it was then necessary for the fireman to get down on the ground and loosen it. The driving rod in its vertical motion traversed a space about two feet wide—down and up—at each revolution of the wheels. It passed just outside of the primer, having a clearance of one and three-fourths inches. When the engine came to a stop and the plaintiff got down out of the cab to adjust the primer the driving rod was at its highest level.

The track at the point where the engine stopped was rock-ballasted. The ballast filled the spaces beteen the ties up level with their surfaces. The ties extended fifteen inches beyond the rail, and the ballast beyond the ends of the ties about two feet. From the ends of the ties the ballast gradually sloped down, the outer edge being approximately six inches lower than the top

of the ties. The surface of the ground next to the ballast was about two feet lower than the top of the tie level.

The two large horizontal cylinders shown by the picture are air-drums. There was an iron step extending down from the gangway, and two hand-holds or grab-irons on each side thereof, one being on the engine and the other on the tank. According to measurements made by one of defendant's witnesses, the front air-drum, which extends down lower than the one in the rear, was four feet, and the iron step one foot and ten inches, above the top of the ties. No measurements are given of the distances of the grab-irons from the surface of the ties. Plaintiff gave three and a half feet as an approximation of the height of the one on the engine, but as shown by the picture it does not extend down to the level of the bottom of the front air-drum. The distance from the primer to the step at the gangway was 9 feet and 10 inches.

Plaintiff was the only witness introduced in his behalf. He says that when they were about a half mile out of Braley, the last station before the Rock Island crossing was reached, he told the engineer that he could not get his injector to work and that the engineer replied, ''All right; I will put mine on, and when we get to the crossing you get down and fix it, and I will wait for you.'' However, when the engine arrived at the crossing, it came to a stop, the engineer gave the usual whistling signal and, finding the crossing clear, started on regardless of plaintiff's movements. The engine was headed south.

So far as the record discloses, no one saw the plaintiff when he left the cab, nor at any time thereafter until he was discovered, by one of the brakeman on the moving train, lying along the side of the track with a crushed foot. His case, therefore, with respect to the manner in which he received the injury and his movements at and immediately prior to the time of its inflic-

tion, rests entirely upon his own testimony. What happened after he left the cab we will let him tell in his own language.

### Direct Examination.

"Q. When did you get off the engine? A. Just as the engine came to a stop I took my coal pick and got down and walked to the injector about six or eight feet, and I stuck my pick in that hole there to turn that to loosen it.

"Q. Which way were you facing? A. I was facing south.

"Q. Which side of the engine would you be on? A. On that side. (Indicating left-hand of engine facing south).

"Q. When you were over here (indicating) which way were you facing? A. Facing south.

"Q. Were you upright or bent down at that time? A. No, sir; I was down (indicating stooping position) in this position, making this turn, facing south.

"Q. What happened to you? A. While I was down here making this turn the engine started; something struck me on the shoulder (indicating) and knocked me down flat along the track, it might have been a drive-rod where the side rod comes down, or it might have been the air-drum, and with this leg (indicating right leg) square under me.

"Q. Which leg? A. My right leg.

"Q. Did it knock you down. A. Yes, sir.

"Q. What was the condition of your knee with reference to being loose or in a bent position? A. My leg was in a position that I couldn't get out of the way; I suppose the track was a little rolling there, and if I could have rolled out and got out of the way without getting off of this leg I probably could have done that, but I couldn't, and the only thing I could do then was to get on the engine.

"Q. Suppose you would have laid in the position you were, what would have happened to you? A. It

would not clear a man there, and it would have mashed him to pieces; the tank truck or step would have caught me.

"Q.   What did you attempt to do?   A. I attempted to get on the engine to save myself.

"Q.   What did you do?   A. I put my foot on the step and got partly up and grabbed the grab-iron—I couldn't say for sure whether I had hold of the grab-iron or not—and my foot slipped off the flange of the step and went under the wheel (indicating).   It all happened in a few seconds.

"Q.   What did you do when your foot was run over? A. After the tank ran over it, it was bound over the rail until I couldn't pull my leg out and I had to take my hand and pull my leg off the rail; every wheel was cutting it a little higher every time.

"Q.   How high was this step that you speak of from the ground?   A. about two feet.

"Q.   Did the hand-hold extend up and down there (indicating)?   A. Yes, sir; it is connected up right at the gangway about three feet and a half.

"Q.   Was there any way you could have saved yourself in the position you were except in the way you did save your life?   A. No, sir, I think not.

"Q.   Did the engineer give you any warning that he was going to start the engine?   A. No, sir."

Cross-examination.

"Q.   And when you came to the Rock Island crossing you dropped down on that side with your pick in your hand to loosen it?   A. After I had told the engineer that my overflow was stuck, that was a half mile out of Braley, and he told me to fix it when we got to the Rock Island Crossing.   . . .

"Q.   You stuck your pick point in the clevis joint? A.   Yes, sir.

"Q. And gave a little turn and pulled your pick out? A. No; while I had my pick in there giving it this turn, that is when the engine started up and knocked me down.

"Q. What became of your pick? A. I suppose it was still lying there; I don't know.

"Q. It was not caught by the driving rod coming down? A. I don't recollect taking it out.

"Q. What was it that struck you? A. It could have been the side rod or the air-drum.

"Q. One of those two? A. Yes, sir.

"Q. Where did it strike you? A. On the shoulder and kind of on the back (indicating).

"Q. On your right shoulder, and how far down the back? A. Down about the shoulder blade.

"Q. That knocked you down? A. Knocked me down, and put my right leg under me, clear on the ground.

"Q. As you said when your deposition was taken, it knocked you down flat? A. Wouldn't that be down flat?

"Q. That is the way you put it in your deposition, didn't you; isn't that what you said, 'clear down flat on the ground?' A. I don't know; the deposition will show, whatever it is.

"Q. (Exhibiting deposition): You signed this deposition there? A. Yes, sir.

"Q. And that question, No. 77, was asked you, 'You don't mean to say you fell clear to the ground?' And you answered, 'Clear down flat on the ground?' A. Yes, sir.

"Q. That is what you said then? A. Yes, sir.

"Q. That is correct? A. Yes, sir.

"Q. It was only one of those two things mentioned by you that struck you on the shoulder? A. It could

have been something else; but then, that would be my idea of what it was.

"Q. What was it? A. I think it was the side rod.

"Q. The driving or side rod that struck you on the shoulder? A. Yes, sir; I think so.

"Q. And that knocked you down? A. Yes, sir.

"Q. Then you undertook to get on the engine by taking hold of the grab-iron; with your left hand or right hand? A. It would be my right hand.

"Q. And at the same time you put your right foot on the step? A. Yes, sir; on the rim of the step; the step would be in this position (indicating); it is a rim here (indicating), and here it is flat (indicating).

"Q. You put your foot on the front rim? A. Yes, sir.

"Q. And your foot slipped off of the place where you put it? A. Yes, sir.

"Q. And it went under the wheel? A. Yes, sir.

"Q. Do you know whether you got hold of the grab-iron or not? A. I wouldn't say for sure whether I did or not; but I presume I got hold of it and my hand slipped off of it.

"Q. You think you undertook to take hold of the grab-iron with your right hand? A. Yes, sir.

"Q. Was it the grab-iron on the engine or the tank? A. On the engine.

"Q. There are two grab-irons? A. Yes.

"Q. Just a little piece apart? A. Yes sir; just the width of the gangway, about two and one-half or three feet apart, but the one on the engine is lower than the one on the tank; it comes down like this (indicating), and the one on the tank comes straight up and down; it would be lower on the engine to get hold of than it would over there on the tank (indicating)."

It seems to be conceded that plaintiff was injured while employed in interstate commerce.

Other facts necessary to an understanding of the legal questions involved will be stated in the course of the opinion.

I. Under instruction numbered one given for the plaintiff, the court submitted to the jury for determination whether "plaintiff, . . . while in the performance of his duties and acting under the instructions of the engineer, . . . got upon the ground for the purpose of working upon the injector . . . and (whether) while (he was) so engaged, the engineer, . . . knowing, or in the exercise of ordinary care should have known, that plaintiff was upon the ground in a position likely to be injured by moving said engine, . . . carelessly and negligently started . . . said engine without giving plaintiff any warning of his intention" so to do. Appellant levels at this instruction a number of criticisms: (1) That it submitted to the jury the question of plaintiff acting under instructions of the engineer, when no such fact was pleaded in the petition; (2) That it gave the jury a roving commission to speculate on whether the engineer "should have known" plaintiff was on the ground; and (3) it submitted the question of whether the engine was started without warning, when the evidence shows that warning was given and that plaintiff heard it. We think these objections all without merit.

*Margin:* Knowledge: Speculation: Instruction: Pleading.

The evidence did not show that the engineer had actual knowledge that the plaintiff had gotten down on the ground. Owing to their relative positions, he could not have seen plaintiff leave the cab. But according to plaintiff's testimony the engineer had previously said to him, "When we get to the crossing, get down and fix the injector, and I will wait for you." He may have forgotten having given this direction to the plaintiff, but certainly the jury could have found that in the exercise of ordinary care he would not have done so and that he would accordingly have ascertained whether

plaintiff followed his instructions before starting the engine. With this evidence before them it was not necessary for the jury to speculate on whether the engineer "should have known" of plaintiff's position.

The petition charged that defendant "through . . . its engineer, carelessly and negligently started said engine without warning the plaintiff." As just pointed out the engineer's instruction to the plaintiff was one of the constituent facts of the alleged negligence; it was therefore, clearly within the scope of the pleadings.

Appellant is in error in saying that the plaintiff had warning that the engine was about to move. The only warning given was the whistling signal indicating that the crossing was clear. This was not notice to plaintiff that the engine was about to start, because the engineer had told him that he would wait for him.

II. In the instruction on the measure of damages, the jury were told that they should take into consideration plaintiff's future suffering and future loss of earnings—if any. The point is made that it was **Permanent Injuries.** not warranted by the evidence. The evidence showed that plaintiff's right foot and ankle were crushed, necessitating an amputation; that at the time of the trial the leg had not healed; that drainage tubes had been inserted in the wound and through these pus and particles of bone were being drawn off; that plaintiff was thirty-two years of age; that he had been working as a locomotive fireman eight or nine years; and that he was earning at the time of his injury $125 a month. This evidence afforded a sufficient basis for the instruction. [State ex rel. v. Reynolds, 257 Mo. 19.]

III. The engineer, on the witness stand, said that he knew nothing about the injector on the fireman's side being out of order, and that the plaintiff said nothing whatever to him about fixing it. On cross-examination **Harmless Testimony.** he was asked if the defendant had not theretofore by bulletin directed its engineers

to operate the injectors. On his admission that such was the case, he was further asked why he did not obey the order. He replied that on that style of engine it was not handy for the engineer to work the injector, and that the fireman voluntarily did it. In this connection he denied that he gave the fireman any instruction of any kind with respect to the injector on the occasion in question. The defendant asked the court to instruct the jury that the bulletin regarding the use of the injector had no bearing on the case and that they should entirely disregard it. This the court refused to do, and its action in that respect is assigned as error. The evidence went in without objection. Respondent insists that it was competent as bearing on the credibility of the engineer as a witness. In any event, it is not apparent how the defendant could have been injuriously affected by it. Certainly it was not so prejudicial as to warrant a reversal.

IV. Appellant's chief contention is that plaintiff failed to make a case and for that reason it was entitled to a directed verdict. This, on the ground that plaintiff's testimony is so at variance with well known physical facts that it has no evidentiary value.

Contrary to Physical Facts.

When established physical facts and common observation and experience conflict with the testimony of a witness, such testimony does not amount to substantial evidence of the alleged facts testified to and cannot be accepted as the basis of a verdict and judgment. [Phippin v. Railway, 196 Mo. 321, 343; Sexton v. Railway, 245 Mo. 254, 272.] Yet, so frequently do unlooked-for results attend the meeting of interacting forces that courts should not indulge in arbitrary deductions from physical law and fact except when they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other. (10 R. C. L. 1009). Plaintiff's testimony should be weighed in the light of these general principles.

According to the plaintiff he was in a stooping position, facing south, the direction the engine would move when it started, at work on the primer. While in that position and so engaged, the engine started and something struck him on the shoulder, down about the shoulder blade, and knocked him down flat along the track with his right leg square under him. It is a matter of conjecture, because he does not say, whether he went down upon his face, his back, or his side, and whether with his feet, or head, toward the front of the engine. All that he states with respect to his position at that juncture is: that he was down flat along the track—clear down flat on the ground—with his right leg square under him, and, because his right leg was under him, he could not roll or get away from the moving train. His further statement is to the effect that, not being able to roll out of the way *because his right leg was under him, he put his right foot on the engine step two feet above the surface on which he was lying.* How he released his right leg so that he could put his right foot on the step he does not explain. It might have been possible for him to have partly raised up, reached the grab-iron three or four feet above him as it approached and pulled his body up sufficiently to disengage his right leg. But that is not what he did. He says: *"I put my foot on the step and got partly up and grabbed the grab-iron—I couldn't say whether I had hold of the grab-iron or not—and my foot slipped off the flange of the step."* He got partly upon the engine *by putting his foot on the step.* There is not a suggestion, or an implication, in his testimony any where that he released his leg by getting hold of any part of the engine, or anything else, and pulling himself up.

It may be that plaintiff was so confused and disconcerted by the perilous position in which he was suddenly placed, by the unexpected movements of the engine, that he is unable to give a rational account of his movements and of the manner in which his foot was

crushed. It may be that after having been knocked down, in obedience to a dominant impulse, he rolled away from the track, scrambled to his feet and in his nervous haste to climb on the engine, missed his footing. This is all speculation, however. In the absence of any evidence to the contrary, we can not assume that plaintiff was in any other position than that in which he says he was when he attempted to get on the engine. But we do hold that his statement that he was lying clear down flat on the ground with his right leg square under him in such fashion that he could not roll away from the moving train and while in that position he put his right foot on the engine stop, two feet above the surface on which he was lying, got partly up and grabbed the grab-iron, is so in conflict with common experience and observation as to be incredible. In passing on the question of whether there was substantial evidence to take the case to the jury, we will, therefore, exclude from consideration that portion of plaintiff's testimony. The only effect that can be accorded it is its bearing on his credibility as a witness, and that is a matter that was solely for the jury to determine. Looking then to the remainder of his testimony, we find him lying clear down flat on the ground along the track with his right leg so confined under him that he can not roll away, having been knocked down in the manner and under the circumstances heretofore detailed. The peril that he apprehends as he lies there is that the tank truck or step will crush or mangle him as they pass over him. We find him an instant later—not struck by the truck or step, but with his right foot on the rail and the car wheels passing over it. We can not say that on this state of the evidence the jury was not warranted in finding that plaintiff's injury was proximately caused by the negligent starting of the engine.

V. The further contention is made that the verdict is excessive. According to a long line of cases decided

by this court, where, as here, the only permanent injury is the loss of a limb, an award of damages in excess of $10,000 will not be allowed to stand.

Other questions are raised, but they are not deemed of sufficient merit to further extend this opinion with their discussion.

In accordance with the views herein expressed, the judgment is affirmed on the condition that the plaintiff within ten days, enter as of the original date thereof, a *remittitur* in the sum of $10,000; otherwise, the judgment is reversed and the cause remanded. *Brown* and *Small, CC.*, concur.

PER CURIAM:—The foregoing opinion of RAGLAND, C., is adopted as the opinion of the court. All of the judges concur.