Alfred KELLY, Appellant,

v.

TERMINAL RAILROAD ASSOCIATION
OF ST. LOUIS, Respondent.

No. 45864.

Supreme Court of Missouri,
Division No. 2.

Sept. 8, 1958.

Rexford H. Caruthers, Shulamith Simon, William R. Kirby, Alexander M. Goodman, St. Louis, for appellant.

George P. Mueller, Evans & Dixon, John P. Montrey, St. Louis, for respondent.

LEEDY, Judge.

Action for $35,000 damages for personal injuries alleged to have been sustained by plaintiff when the automobile in which he was riding as a guest of the driver-owner was struck by defendant's Diesel switch engine (and cut of cars) at a public crossing in the City of St. Louis. Verdict and judgment went for defendant, and, after an unavailing motion for new trial, plaintiff appealed. The points briefed relate to the giving of defendant's sole cause instruction, the admissibility of certain evidence, and the closing argument of defendant's counsel.

Plaintiff submitted his case upon hypotheses of both primary negligence (in failing to sound a warning by blowing the whistle or ringing the bell, and in failing to have a headlight burning), and humanitarian negligence (in failnig to stop). At defendant's request the court gave instruction No. 7, which hypothesized the negligence of the driver of the automobile as the "sole, only and direct cause" of the collision. Plaintiff asserts that this constituted error, contending, first, that the evidence adduced by defendant did not present a situation in which the defense of sole cause was available (because affirmatively showing humanitarian negligence on defendant's part); and, secondly, that the form of the instruction was bad for the reason it did not negative the humanitarian negligence pleaded and submitted by plaintiff. While not conceding error in the giving of this instruction, the defendant says that, in any event, plaintiff could not have been prejudiced by it because there was no believable evidence that defendant's train could have been stopped after the automobile went into a position of discoverable peril, and hence plaintiff did not make out his case of humanitarian negligence predicated upon failure to stop.

The casualty occurred about 8:30 P.M., December 24, 1951 (Christmas Eve) at the intersection of East Prairie and McKissock, public streets in the City of St. Louis. East Prairie runs east and west, McKissock north and south. Two sets of railroad tracks run north and south either on, or alongside, McKissock. The westernmost of these is for southbound traffic; the other for northbound traffic. (The precise width of neither street appears; only that they are narrow. One witness described McKissock as no wider than 15 feet. This, we take it, has reference to the traveled portion, i. e., between the track on which the collision occurred and the west boundary of the street.) The motor car in question was a 2-door 1948 Plymouth in which there were three persons, all riding in the front seat: Ploch, the driver-owner; plaintiff, Kelly, who was in the center, and Edward Fitzgibbons, who was seated on the extreme right. Weatherwise, it was sleeting and raining—"a freezing drizzle." The streets were slippery. There was a little restaurant at the northwest corner of the intersection on (or in front of) which there was a lighted electric sign displaying the word "Eat." Plaintiff claimed that this sign, under the existing weather conditions, had the effect of creating a "curtain of darkness" to the north of East Prairie. There was a street light at the southwest corner of the intersection, and another on McKissock north of the crossing, but this one, too, was said by plaintiff's witnesses to have been not visible because of the aforesaid "curtain." Ploch's car, in which plaintiff was riding, was proceeding east on East Prairie, and defendant's switch engine was moving south. The collision occurred on the westernmost of the two sets of railroad tracks at the intersection. The Diesel was backing with either one or two cars attached on the north end. (Plaintiff's proof showed both.) In any event, one car was a load of livestock; the other, if any, was a caboose. The cab was at the rear (or southernmost) portion of the engine. Four members of the crew were riding in the cab; the other was on the north end, on the outside, and from where he was riding he did not have a view of the crossing. There are crossing gates at

the crossing, but they are operated only in daytime, and not at night. The driver was familiar with the crossing, having previously traveled the street many times. (On the issue of primary negligence—not presently involved—plaintiff's evidence was to the effect that before the collision no whistle was blown, no bell was rung, and the engine did not have its headlight turned on, nor were there any lights on inside the cab. In fact, one of plaintiff's witnesses said that a member of the switching crew stated at the scene that they "run like that all the time"—without a headlight, without sounding the bell, and without blowing the whistle. Defendant's evidence was directly and positively to the contrary.)

The essence of the proof offered by plaintiff touching the issue of his position of imminent peril appears from the following excerpts from his statement of facts: As the Ploch car approached McKissock it was going no more than 5 to 10 miles an hour, and Ploch stopped a little distance back [west] from the tracks, 12 feet or something like that. It came to a complete stop. The plaintiff and Ploch looked to the north and looked to the south and did not see or hear anything. The car was stopped about even with the little restaurant across the street on the corner. Neither plaintiff nor Ploch could see more than 25 or 30 feet to the left or north. It was very dark in that direction. There was a light on the northwest corner, an electric sign for the restaurant, and it was on that night, and as one looked it was just like a black wall, a dark curtain setting there. As one looked to the left, one could not see any light or anything through that black wall to the north. Neither Ploch nor the plaintiff saw any object moving toward them from the north going south. After looking to the left and to the right, Ploch saw nothing and started to go across.

As Ploch started up he was going slowly, some 3 to 5 miles an hour, 2 to 3. (He had no trouble in starting up because of the ice.) The first time he saw the train or engine was when it came out of the darkness. At that time his front wheels were between the rails of the westernmost set of tracks. The engine was then about 20 feet away. Ploch was unable to estimate the speed of the train because the accident happened too fast. Plaintiff testified Ploch stopped "about the length of a car" from the tracks; that he [plaintiff] looked to the north and to the south, and didn't see anything, or hear anything; that Ploch "started up, he put it in gear, and started up slowly; we was just in the middle of it. The car took us onto the tracks, and the next thing I knew something hit us." He further testified that from the time Ploch started up an automobile length from the track it would take "maybe a second or two, you would be up on the tracks;" that when the accident happened the automobile "couldn't have been going very fast; he was going slow;" witness could not estimate the speed in miles. (The engine struck the car just behind the hood and fender and front door. After the impact the car was carried down the tracks about a half a block, according to plaintiff's witness. The three passengers were bouncing around hitting the sides.)

The evidence introduced by plaintiff is devoid of any showing or effort to show the distance in which the train could have been stopped, and there were no circumstances from which present ability on the part of defendant to have timely stopped might have been inferred, so that the submission of that issue is not supported by any evidence *appearing in plaintiff's own case*, and defendant's motion for a directed verdict should have been sustained, unless plaintiff is correct in his contention that a submissible case of humanitarian negligence affirmatively appears from the testimony of certain of defendant's witnesses. The evidence as to the speed of the train becomes important in resolving this latter question. The only testimony in relation to that subject consisted of estimates by members of the crew. Those expressing an opinion thereon (including the engineer, on

whose testimony as to stopping distance the plaintiff relies) were unanimous in estimating the speed of the train as it proceeded south on McKissock toward the crossing as being 15 to 20 miles per hour. It is unnecessary to burden this opinion with a detailed review of all the other facts appearing in the testimony of the five-member switching crew, who, incidentally, were the only other eyewitnesses. It is sufficient to say that, unless there is validity in plaintiff's claim just referred to, the defendant's evidence, if believed by the jury, was amply sufficient to have compelled a finding for the defendant. Proceeding, then, to the substance of the testimony of the defendant's witnesses relied on by plaintiff (and crucial to his claim of humanitarian negligence appearing from defendant's own evidence), we find it to consist of the following, as tersely stated in his brief:

"The defendant's evidence chiefly came from the train crew and one of its railroad policemen. Their testimony showed that it was a raining and freezing night, that it was dark at the time of the accident, that the streets were icy, and that the automobile in which plaintiff was riding was sliding and skidding when each one of the crew saw it. The policeman also testified to the presence of the car's skid marks. The 'head man' testified that he could see fifty or sixty feet ahead of the engine that evening. The foreman testified that he first saw the automobile when it was two car lengths 'this side (west) of the main line tracks,' that at that time the train was 35 feet north of East Prairie, and that the brakes had already been applied at the time. The engineer, a man of 43 years of railroad experience, testified, both at his deposition and at the time of trial, that under the circumstances existing that night the engine could be stopped in about ten or twelve feet."

Without pausing to determine whether plaintiff is entitled to the benefit of the testimony of defendant's witnesses with respect to the automobile sliding and slipping onto the track in front of the approaching train (because contrary to his own theory of the case), or whether, for like reason, defendant is entitled to the benefit of plaintiff's contrary evidence as to the Ploch car having stopped within 12 feet of the track and slowly started up and proceded toward the track without sliding or slipping, we go to the decisive question of the sufficiency of the proof on the issue of defendant's ability to have stopped, and this irrespective of which of the conflicting fact situations is regarded as the proper criterion.

■ Testimony which is manifestly untrue, incredible, impossible, or contrary to scientific principles established by the laws of physics or mechanics does not amount to substantial evidence, has no probative value, and is to be disregarded. 20 Am. Jur., Evidence, §§ 1183, 1184. This doctrine has been applied in many cases in this state. For examples, see East v. McMenamy, Mo., 266 S.W.2d 728; State ex rel. Kansas City Southern R. Co. v. Shain, 340 Mo. 1195, 105 S.W.2d 915; Mahl v. Terrell, 342 Mo. 15, 111 S.W.2d 160; Miller v. Schaff, Mo., 228 S.W. 488; Kibble v. Quincy, O. & K. C. R. Co., 285 Mo. 603, 227 S.W. 42.

■ It is to be borne in mind that the switch engine was pulling a car of livestock and perhaps a caboose. It was sleeting and conditions underfoot were icy. By all estimates, the train was traveling 15 or 20 miles an hour. At those speeds the distances traveled would have been respectively, 21.9 and 29.2 feet per second. Plaintiff relies wholly upon, and asks us to accept, the engineer's testimony that the train could have been stopped in 10 or 12 feet under the conditions just mentioned. This would mean that, assuming the speed of the train to be 20 miles per hour, it could have been stopped in one-third of a second, or, at 15 miles per hour, in one-half a second. This is so contrary to common knowledge and experience and

the laws of physics as to be manifestly incredible and impossible, and is therefore rejected. There being no substantial evidence whereon to base the submission of the issue of defendant's ability to stop, it must be held that, for such want or omission, the plaintiff failed to make a case on that issue. No error is assigned with respect to any aspect of defendant's sole cause instruction other than that involving plaintiff's humanitarian submission, so that the ruling just made necessarily disposes of all live objections raised against the instruction.

■ Error is assigned in the admission, over plaintiff's objection, of insurance claim records of the Lincoln-Mercury plant of Ford Motor Company (at which plaintiff was employed), the contention being that these should have been excluded because they did not comply with the Uniform Business Records as Evidence Law, sections 490.660–490.690 RSMo 1949, V.A.M.S. The offending records were report forms the blanks in which had been purportedly filled out by plaintiff's own physicians and by them returned to the employer in substantiation of plaintiff's claims for accident and health benefits under the employers' group insurance policy issued by the John Hancock Insurance Company. Dr. Britt, a neurologist, the only medical witness called in the case, testifying on behalf of plaintiff, stated he had examined plaintiff from time to time and that in his opinion the collision was the competent producing cause of Mr. Kelly's nervous disorder previously described by the witness, the details of which are, for present purposes, unimportant. The reason that the insurance claim records are claimed to have resulted in prejudice is that Dr. Britt was asked on cross-examination by way of a hypothetical question whether or not hypertension and acute cholecystitis, Meniere's Disease, hypertensive cardiovascular disease and a mild and old cerebral vascular accident could have been competent producing causes of the plaintiff's present symptoms (these conditions or causes of disability were reported in the claims records), but the doctor did not reply to this question wholly in the affirmative, as plaintiff now suggests. As a matter of fact, his answer to this hypothetical question eliminated all of the conditions described above as being producing causes except that of a stroke, the witness saying in that connection that "if he had had a stroke such as you refer to as being a possibility, I would feel that that would be a competent producing cause." But it was shown (and of which no complaint is made) that plaintiff had written a letter to the Veterans' Administration (in answer to a communication from that agency relating to its efforts to recover overpayments of benefits allegedly made to him) in which he, Kelly, stated that he had suffered "several cerebral hemorrhages and sicknesses" which he had noticed beginning in the year 1950, and plaintiff had himself introduced a report of his neuropsychiatric examination performed by the Veterans' Administration in which he was quoted as having described his condition under the heading "Chief Complaint" as "cerebral thrombosis and many strokes." Thus it will be seen that as regards the single item which Dr. Britt agreed might be a producing cause of plaintiff's condition, i. e., a mild and old cerebral vascular accident, its existence had been otherwise shown in the manner last above described, so that the challenged records, in the respect complained of, would have been, in any event, merely cumulative. Moreover, on re-direct examination, Dr. Britt reaffirmed his opinion that the competent producing cause of plaintiff's then condition was the collision, these specific questions and answers appearing as the concluding portion of his re-direct examination. "Q. Doctor, is there anything Mr. Montrey [defendant's counsel] has asked you to assume here that would change your diagnosis as you have previously given it to us in answer to the hypothetical question I gave you? A. No, there is nothing. Q. As far as I un-

derstand it, then, the incident that I outlined on December 24, 1951, was the competent producing cause of the conditions that you found on your examinations? A. In my opinion, it was a competent producing cause." In this situation it is apparent that the admission of the challenged reports could not have resulted in prejudice to the plaintiff, and his contention in that regard is untenable, and we so hold without reaching the question of their admissibility under the statute.

■ It is next contended that the trial court erred in admitting the testimony of defendant's witness Crow "as to his purchase of pornographic material from plaintiff because it was evidence of a purely collateral matter and had no probative value on any issue in the case." We fail to find an objection to that portion of Crow's testimony upon which the foregoing point is based, i. e., *purchases* of pornographic material. Only two objections were made to Crow's testimony. The first was directed at defendant's inquiry concerning what plaintiff *told* the witness (on the occasion of their first becoming acquainted in December, 1954) "with reference to the subject of pornographic literature." The objection interposed was that it was "immaterial to any issue in this case and highly prejudicial." Being overruled, the witness then replied that plaintiff told him "he could get pornographic literature for me * * * ; that he had ten people selling for him on the outside and fifteen for him inside the plant." Thereafter, and continuing over the next six pages of the transcript, the witness described the offending materials he had purchased from plaintiff, to none of which was there any objection until near the close of the direct examination when defendant's counsel asked that "for the purpose of identification * * * the witness pick out some items and give them to us in the packages so that they can be marked by the reporter." It is true that at that juncture plaintiff's counsel stated, "My objection is

to this whole line of questioning, Your Honor. It is highly irrelevant and immaterial to any of the issues here involved, and I agree that it is highly scandalous here." But the testimony concerning the purchases had come in without objection, and the objection last above quoted not having been accompanied by motion to strike, to admonish the jury, nor to declare a mistrial we hold plaintiff is not in position to urge the point now raised.

■ The final point concerns and is directed against the closing argument of defendant's counsel. Here, again, there were no objections raised at the trial, but plaintiff says that notwithstanding this omission, review is warranted under Rule 3.27, 42 V.A.M.S., because of the insidious nature of the offending argument. Specifically, the complaint is that counsel argued that in his testimony plaintiff had committed perjury, and characterized plaintiff as "a man who will do anything for a buck, anything, and that includes fixing and framing this personal injury case." It would unnecessarily lengthen this opinion to give even an outline of the numerous facts upon which the accusations of perjury and the characterization just referred to were bottomed. It is sufficient to say that there were such sharp, direct and irreconcilable conflicts between the proofs adduced by the opposing parties as to leave no question in the mind of a fair-minded juror that one or the other of said versions was false and perjurious so that under the facts plaintiff's credibility was legitimately subject to searching inquiry, and the argument, while extremely vigorous and pointed, appears to have had foundation in the record. At any event, we need not speculate on whether or not the trial court would have intervened had plaintiff objected. Having seen fit to withhold his objections and take his chances with the jury, he is not now in position to complain.

The judgment should be, and it is, affirmed.

All concur.