James P. BLIND, (Plaintiff) Appellant,

v.

SAKS FIFTH AVENUE, INC., Weisels-Hoehn Real Estate Company, Albert Ross, Floyd Weekley, (Defendants), Saks Fifth Avenue, Inc., Weisels-Hoehn Real Estate Company, (Defendants) Respondents.

No. 30612.

St. Louis Court of Appeals.

Missouri.

Sept. 19, 1961.

Motion for Rehearing or to Transfer to Supreme Court Denied Oct. 17, 1961.

Hocker, Goodwin & MacGreevy, Donald J. Stohr and John M. Goodwin, St. Louis, for appellant.

David G. Dempsey, Barnhart & Sommers, Donald B. Sommers, St. Louis, for respondent Saks Fifth Avenue, Inc.

William Kohn, St. Louis for respondent Weisels-Hoehn Real Estate Co.

RUDDY, Acting Presiding Judge.

This case comes to the writer on reassignment. It is a suit by plaintiff, appellant herein, for personal injuries sustained in a collision between two automobiles. Plaintiff obtained a verdict and judgment in the amount of $5,000 against defendants, Weisels-Hoehn Real Estate Company, Saks Fifth Avenue, Inc., and Albert Ross. There was a verdict in favor of defendant Lloyd Weekley.

Separate motions for a directed verdict and for a new trial were filed by defendants, Weisels-Hoehn Real Estate Company and Saks Fifth Avenue, Inc. Defendant Albert Ross filed a motion for new trial only. The trial court sustained the separate motions of Weisels-Hoehn Real Estate Company and Saks Fifth Avenue, Inc., for a directed verdict and entered judgment in favor of each of said defendants in accordance with their separate motions and further ordered that said defendants' motions for a new trial be denied if its action in sustaining said motions for directed verdict be reversed on appeal. The trial court overruled the motion for new trial filed by defendant, Albert Ross. The individual defendants will be referred to by their last names and the corporate defendants as Weisels-Hoehn and Saks. Plaintiff has appealed from the judgment of the court sustaining the separate motions for directed verdict of Weisels-Hoehn and Saks.

Plaintiff insists that there was substantial evidence to support the jury findings that defendant Ross was the servant of Saks and was acting as servant and on behalf of Weisels-Hoehn at the time of the collision.

In determining whether plaintiff made submissible issues, in the above respects, for the jury, we must view the evidence in the light most favorable to plaintiff and accord to him the benefit of all favorable inferences that reasonably arise from all the evidence. Rhyne v. Thompson, Mo., 284 S.W.2d 553; Brown v. Pennsylvania Fire Ins. Co. of Philadelphia, Mo.App., 263 S.W.2d 893.

On March 17, 1958, plaintiff was operating a 1958 Ford automobile westwardly on McPherson Avenue, a four-lane highway in the City of St. Louis, on which there were streetcar tracks. At the intersection of Mc-

Pherson and Euclid Avenues he brought his Ford to a stop, the intersection being protected with four way boulevard stop signs. The stop sign for traffic traveling westwardly on McPherson was 8 to 10 feet east of the east curb line of Euclid. Immediately ahead of plaintiff, as he was driving toward the intersection, was a tractor-trailer truck. The tractor-trailer was making a left turn to go southwardly on Euclid. After the tractor-trailer pulled forward, preparatory to making the left turn, plaintiff stopped his car at the stop sign for westbound traffic. On the day in question a light snow was falling and the streets were "a little bit wet—they weren't icy but they were wet." Plaintiff's car was stopped about 2 to 2½ feet north of the center of McPherson and no part of his car was south of the center of the street.

While in this stopped position, plaintiff saw for the first time a black Studebaker car driven by defendant Ross, the front end of which was just north of the south curb line of McPherson, at which time the tractor-trailer truck was in the act of making a left turn and when doing so blocked the progress of northbound traffic on Euclid. At the time plaintiff first saw the Studebaker car the back end of said car was "just about even with the stop sign" for northbound traffic on Euclid. The distance from the stop sign to the south curb of McPherson was about 14 feet. When plaintiff first saw the Studebaker car it "was heading in a northeast direction, trying to go around that corner." By this plaintiff meant the Studebaker car was attempting to turn right onto McPherson.

When plaintiff first saw the Studebaker car traveling "in a northeast direction," he said, "it was coming right at me." The right front of the Studebaker car hit the middle of plaintiff's car. The impact slammed plaintiff's car into a fire plug. Plaintiff estimated the speed of the Studebaker car when he first saw it at 30 miles per hour and it never did slacken its speed before the collision, nor was a horn sounded. Plaintiff heard nothing that would indicate the brakes had been applied prior to the collision and testified it was impossible to reach a speed of 30 miles per hour in a distance of 14 feet. When the collision took place the tractor-trailer truck was still in the intersection making a left turn onto Euclid and was moving 3 or 4 miles per hour. The Studebaker car could not have proceeded north on Euclid without colliding with the tractor-trailer truck. Defendant Ross, driver of the Studebaker car, told a police officer in the presence of plaintiff that "he worked for Saks Fifth Avenue." Plaintiff thought the distance from Maryland Avenue to McPherson Avenue on Euclid Avenue was 2 or 3 blocks. Plaintiff did not know whether the police checked the brakes on the Studebaker car after the collision. He saw defendant Ross get into the car, with a policeman looking on, but he did not know what Ross did.

Defendant Albert Ross testified as a witness for plaintiff. Ross said he was employed by Saks as a parking lot attendant at 4637 Maryland Avenue. The lot was used for parking cars of the customers of Saks and was also used for this purpose by the tenants of the Maryland Medical Building and the patrons of the tenants. Randolph Milton, employed to park cars for tenants and patrons of the Medical Building, was also an attendant on the parking lot. Ross explained that his duties were to park the cars "for the customers" and to give them a ticket when the car was parked. Two kinds of tickets were used in connection with the parking of cars on the lot. If the one parking the car was a customer of Saks, he or she, was given a white ticket with brown letters. If the one parking the car was a tenant of the Medical Building or a patron of a tenant, he or she, was given a brown ticket with darker brown letters. Saks furnished the white tickets. The brown tickets were furnished by the Medical Building. Concerning the parking procedure on the lot the following interrogation took place:

"Q. Now, when an automobile would come on the lot, for instance,

someone would drive his car on the lot, what would be the procedure? A. Their procedure would be to drive on the lot and tell us where they were going and we will give them a ticket, and if they want us to park them, we will do it or they will park their cars themselves.

"Q. What would happen, for instance, if you were busy parking a car and another car came on the lot—a customer of Saks Fifth Avenue? Would the other boy take care of it while you were engaged? A. Yes, he would.

"Q. I assume the same arrangement worked if he was busy and a patron of the medical building came in, you would take care of that person? A. That is right.

"Q. So you would carry both kinds of tickets? A. That is right."

It was part of his duties to deliver cars of the customers of Saks down to the store, which was a short distance from the parking lot, and to bring cars from the store for parking on the lot. Ross was asked if there were occasions when Randolph Milton would bring cars to and from Saks' store when he was busy and he answered "Never."

Ross further testified that the west side of the lot was for the cars of the customers of Saks and the east side was for the cars of the tenants and patrons of the Medical Building. He said his salary was paid by Saks and at the time he went to work for them he was instructed to cooperate with Randolph Milton, the other attendant on the parking lot.

He was not supposed to take a customer's car off the lot, unless he was directed to bring it down to Saks' store at the request of the doorman at the store. When asked if it was not a fact that he was not supposed to operate a customer's car without the customer's permission, except the occasions when he was directed to bring the car to the store, he answered: "my instruction was to move the car if it is on the wrong side of the lot—on the other side of the lot—without the customer's permission or anyone else's permission. If it is on my side—if it is on the Medical Building—if it is my side, which is wrong, I should move it to the Medical Building side." He admitted that he was instructed not to drive a customer's car, except to move it from one side of the lot to the other.

When Ross was asked from whom he received his instruction, he said, Mr. Summerfield and Mr. Cavanaugh, Manager and Assistant Manager, respectively, of Saks. They never gave instructions to Randolph Milton. Milton received his instructions from Dr. Flance. Dr. Flance was the only one who gave instructions to Milton as far as Ross knew. However, he added, that Dr. Flance told him and Milton to "work together" when they were busy. Ross had been an attendant on the lot for 2 or 3 years. The parking lot would hold about 100 cars. There were about 20 to 25 cars on the lot at the time Weekley brought in his car.

Ross recalled when Floyd Weekley brought his Studebaker car to the parking lot on March 17, 1958. When Weekley drove into the lot neither attendant met him. Weekley parked his car on the west side of the lot, got out of it and came to Ross for a ticket. Upon learning he was a patron of one of the tenants of the Medical Building, Ross gave him a brown ticket. Learning that Weekley had not left the keys in his car, Ross told him, "you have to leave the keys to your car, because you are on the wrong side of the lot." Weekley left the keys to the Studebaker car with Ross and after business had slowed down on the lot, Ross told Milton that he would move the Studebaker car from the west side of the lot to the east side. When asked if he moved the car because he "had the keys to the car," he answered, "Because it was on the wrong side of the lot."

In describing the events that preceded the collision, Ross said that he got into the Studebaker car, started it, and then put it in reverse. The car "shot straight back" about 50 or 60 feet. Before it came to a stop and without applying the brakes, he then put the car in forward drive "and it took off and—went out the lot." At the time he put the car in forward drive he was about 100 feet from Maryland Avenue. When he got outside the lot he was on Maryland Avenue, where he turned right to proceed westwardly. He was asked, "Why didn't you stop the car at that point or did you stop?" he answered, "No, I didn't stop the car." He admitted he did not apply the brakes at this point. He said that up to this point he never applied the brakes and never took his foot off the gas pedal. He then was asked, "You didn't intend to either, did you?" and he answered, "Yes, I did, but it didn't occur to me I had to take my foot off and put it on the brakes." He never touched the brake pedal as he drove the car off the lot and never did reach for the emergency brake. He said that since the car was off the lot and into the street, it was his intention "to drive it around and put it back on the lot." He drove westwardly on Maryland to Euclid, which was the first intersecting street west of the parking lot. He admitted there was a stop sign at Euclid for westbound traffic. Apparently he failed to obey the stop sign. At Euclid he made a right turn and proceeded north. The two streets north of Maryland, intersecting Euclid, were private streets with gates that prevented entrance. The first street north of Maryland that permitted a right turn was McPherson. As he approached McPherson he saw a tractor-trailer truck in the intersection and saw a stop sign for northbound traffic. He then tried to apply the brakes on the Studebaker car and found that he did not have "any brakes at all." When he first attempted to apply the brakes he thought he was traveling 20 to 30 miles per hour. His application of the brakes failed to slow down the car and he was unable to stop the car for the stop sign. When he attempted to make a right turn to go east on McPherson he saw plaintiff's Ford car in the middle of McPherson. Immediately thereafter, he collided with plaintiff's car and estimated his speed at the time of the collision at 25 miles per hour.

Ross admitted he drove many different makes of cars every day and had driven a Studebaker car before. He said he attempted to use the emergency brake and it failed to work. He admitted that at no time after he got in the car and until he reached the intersection of Euclid and McPherson did he attempt to apply the foot brake or use the emergency brake. During all of this time and distance he never did take his foot off of the gas pedal. He was asked, "From the time you got into the Studebaker up until the time this accident happened, did you ever once try turning the key off?" and he answered, "I was too excited; I didn't think of it." The presence of the tractor-trailer truck in the intersection had nothing to do with his decision to make a right turn at McPherson, Ross stating it was his intention to so turn. He said Weekley said nothing to him about the brakes.

Ross said he lived at 4604 Enright Avenue, which is about 7 blocks north of Maryland Avenue. The collision occurred about lunch time, but he denied that he was going home to lunch. At the scene of the collision he tried to tell one of the police officers about the condition of the brakes, but the officer refused to listen to him. Ross did not ask Weekley for permission to drive the car off of the lot. There was an alley, 20 feet in width for east and westbound traffic, behind the parking lot, that extended from Euclid Avenue to Taylor Avenue.

Defendant Weekley testified as a witness for plaintiff. He said he drove his Studebaker car onto the parking lot and told Ross he was going to the Maryland Medical Building. He was given a parking ticket and told by Ross to leave the keys to the car, which he did. He supposed Ross want-

ed the keys in order to move the car. Upon returning for his car he was told to go to a police station where he was informed that his car had been wrecked. Ross did not tell him he intended to take the car off of the lot and Ross was not given permission to do so. When Weekley left the car on the parking lot the brakes were good. He said he had made a number of stops on the way to the Medical Building and experienced no difficulty with either the foot brakes or the emergency brake. After the accident he tested the brakes and found them in good condition.

Mrs. Mabel Harig, one of the original defendants in the case, was called as a witness by plaintiff. At the conclusion of her testimony plaintiff dismissed his case as to her. She testified that she was the Secretary of the Weisels-Hoehn Company and that the company was agent for the owners of the Maryland Medical Building. As such it employed Randolph Milton as a parking lot attendent. Later, she could not recall who hired Milton. His salary and that of a watchman were paid by Weisels-Hoehn out of the rentals collected by it from the Medical Building. However, in determining needed maintenance and repairs to the building, Weisels-Hoehn must consult the owner. If the parking lot attendent terminated his services Weisels-Hoehn would arrange for a replacement. The tickets used for the Medical Building patrons and tenants using the parking lot were paid for out of the rents collected by Weisels-Hoehn.

Plaintiff's Exhibit 5 was offered in evidence and was received, parts of which were read to the jury. This exhibit was a lease agreement covering the parking lot and showed that the Lessor, Lockhart's, Inc., was the owner of the parking lot at the time the lease was executed. Saks succeeded to the title of Lockhart's, Inc., and was the owner of the parking lot at the time of the collision in question. In said lease it was shown that Mabel Harig, as lessee, was holding title to the Maryland Medical Building for the benefit of Dr. I. Jerome Flance, Dr. Michael P. Karl, Dr. Maurice J. Prees and Martha B. Weisels. Prior to the date of the collision, Mabel Harig executed quit-claim deeds conveying all of her interest to the aforesaid parties and they became the record title owners of the Medical Building and lessees under the parking lot lease.

The aforesaid evidence constituted plaintiff's case. At the close of plaintiff's case defendants, Saks and Weisels-Hoehn, filed their separate motions for a directed verdict. These motions were overruled by the trial court. Thereupon, the attorney for Saks informed the court that his client elected to stand upon its motion for a directed verdict and would take no part in any further proceedings in the case. Thereafter, as we have pointed out, the trial court, after verdict, sustained the motion of defendant, Saks, for a directed verdict.

Inasmuch as we have related all of the evidence pertinent to the liability of Saks for plaintiff's injuries, we shall now discuss plaintiff's first contention that the trial court erred in sustaining the motion of defendant Saks for a directed verdict for the reason there was substantial evidence to support the jury finding that defendant Ross was the servant of Saks at the time of the collision mentioned in evidence.

Saks in answer to this contention of plaintiff states that the only possible connection made in the record between the business of Saks and the operation of the Weekley car by Ross was the testimony by Ross that the car forced him off the parking lot and he was attempting to return at the time of the collision. Saks contends that without the benefit of this testimony the only inference in the record would be that Ross was going home for lunch and that this clearly would not be within the scope of his employment by Saks. In support of its position Saks contends that the testimony of Ross is so manifestly untrue and contrary to physical facts that a verdict against it could not be supported by it,

citing Kelly v. Terminal Railroad Ass'n of St. Louis, Mo., 315 S.W.2d 699.

It is the contention of Saks that the testimony of Ross as to how the collision occurred is "a tissue of lies" and the result of a "wild imagination totally unworthy of belief." Saks points to the law as stated in Kelly v. Terminal Railroad Ass'n of St. Louis, supra, 315 S.W.2d loc. cit. 702, as follows:

"Testimony which is manifestly untrue, incredible, impossible, or contrary to scientific principles established by the laws of physics or mechanics does not amount to substantial evidence, has no probative value, and is to be disregarded. 20 Am.Jur., Evidence, §§ 1183, 1184. This doctrine has been applied in many cases in this state. For examples, see East v. McMenamy, Mo., 266 S.W.2d 728; State ex rel. Kansas City Southern R. Co. v. Shain, 340 Mo. 1195, 105 S.W.2d 915; Mahl v. Terrell, 342 Mo. 15, 111 S.W.2d 160; Miller v. Schaff, Mo., 228 S.W. 488; Kibble v. Quincy, O. & K. C. R. Co., 285 Mo. 603, 227 S.W. 42."

■ In the aforesaid Kelly case the court held that testimony to the effect that a train could have been stopped in 10 or 12 feet when traveling 15 to 20 miles per hour while pulling a car of livestock and perhaps a caboose, and where conditions underfoot were icy, was so contrary to common knowledge and experience and the law of physics as to be manifestly incredible and impossible and, therefore, should be rejected. The testimony of Ross in the instant case borders on the incredible. However, we are not the triers of the facts and we cannot say that the testimony of Ross is opposed to physical law and is so clear and irrefutable that no room is left for the entertainment by reasonable minds of any other conclusion. Van Houten v. Kansas City Public Service Co., 233 Mo.App. 432, 122 S.W.2d 868. The fact is the jury found in favor of plaintiff and against all defendants, except Weekley. Therefore, the

jury must have believed the testimony of Ross, at least in some respects. The members of the jury are the sole judges of the credibility of the witnesses. We cannot say, as a matter of law, that the testimony of Ross, in whole or in part, was untrue, impossible or opposed to the law of physics. Doyle v. St. Louis Merchants' Bridge Terminal Ry. Co., 326 Mo. 425, 31 S.W.2d 1010, loc. cit 1012.

In the case of Bloecher v. Duerbeck, 338 Mo. 535, 92 S.W.2d 681, loc. cit. 685, the court, citing Parrent v. Mobile & Ohio R. Co., 334 Mo. 1202, 70 S.W.2d 1068, 1074, wherein they quoted from 10 R.C.L. 1008, and in doing so, said:

" 'It requires an extraordinary case to authorize the court to regard sworn testimony as manifestly impossible and untrue. * * * So frequently do unlooked-for results attend the meeting of interacting forces that courts should not indulge in arbitrary deductions from physical law and fact except when they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other.' See also, Schupback v. Meshevsky (Mo.Sup.) 300 S.W. 465; Gately v. St. Louis-San Francisco R. Co., 332 Mo. 1, 56 S.W.2d 54."

The mere fact that the testimony given by Ross is not plausible does not destroy its probative value. 20 Am.Jur., Evidence, § 1183, p. 1033. The credibility of the testimony of Ross was for the jury's determination.

■ We now take up for discussion and ruling the contention of plaintiff that there was substantial evidence to support the jury finding that defendant Ross was the servant of defendant Saks at the time of the collision. The mere fact that Ross was in the general employ of Saks at the time of the collision cannot make it liable for the actions of Ross. Green v. Western Union Telegraph Co., Mo.App., 58 S.W.2d 772. The test is whether Ross at the time

of the collision was engaged in the performance of his master's business concerning which he was employed. Miceli v. Williams, Mo.App., 293 S.W.2d 136, and Green v. Western Union Telegraph Co., supra. Therefore, the question presented by this contention of plaintiff is whether the evidence was sufficient to show that Ross was acting within the scope of his employment at the time the collision mentioned in evidence took place.

■ Whether a servant is, in fact, acting within the scope of his employment is ordinarily a question for the jury. If there is any evidence which would justify the jury in finding that the driving of Weekley's car by Ross at the time of the collision was incident to an attempt on his part to do his employer's business, then we must hold that the plaintiff's case against Saks was for the jury. Barger v. Green, Mo. App., 255 S.W.2d 127, 131.

In Bova v. St. Louis Public Service Company, Mo.App., 316 S.W.2d 140, loc. cit. 144, we had a question similar to the one now under discussion. In determining when an act is within the course and scope of one's employment, we said:

"In Maniaci v. Interurban Express Co., 266 Mo. 633, 182 S.W. 981, the Supreme Court quotes with approval from Mechem on Agency, as follows: (182 S.W. 981, loc. cit. 985)

"'* * * in general terms, it may be said that an act is within the course of the employment if (1) it be something fairly and naturally incident to the business, and if (2) it be done while the servant was engaged upon the master's business and be done, although mistakenly or ill advisedly with a view to further the master's interests, or from some impulse or emotion which naturally grew out of or was incident to the attempt to perform the master's business, and did not arise wholly from some external, independent, and personal motive on the part

of the servant to do the act upon his own account.'"

Applying the aforesaid rules to the evidence of plaintiff, we must rule that there was substantial evidence to support the finding of the jury that Ross was the servant of Saks at the time of the collision in question and at said time was acting within the course and scope of his employment.

The evidence clearly shows Ross was an employee of Saks hired by it to serve as an attendant on a parking lot which Saks owned and had leased unrestricted parking facilities on said lot to the owners of the Maryland Medical Building, subject to the lessor's (Saks) right to make reasonable rules and regulations as may be necessary for the operation of the parking lot. Both attendants parked cars for both users of the lot and each carried "both kinds of tickets." If Ross was busy Milton would park Saks' cars and if Milton was busy Ross would park the cars of the tenants and patrons of the Medical Building. The west side of the lot was for Saks' customers and the east side was for Medical Building cars.

When Ross was employed he was instructed by the Manager and the Assistant Manager of Saks to cooperate with Milton. He was instructed to move any car that was on the wrong side of the lot to the right side. He was following these instructions when he attempted to move Weekley's car from the west side of the lot to the east side. At least a jury could so find from the evidence. Ross said he was moving Weekley's car because it was on the wrong side of the lot. This evidence, if believed by the jury, was sufficient for the jury to find that at the time Ross got into Weekley's car with the intention to move it to the right side of the lot, he was then doing something fairly and naturally incident to the business of his employer, Saks, and it was done with a view to benefit and further his employer's business, in that he wanted to keep the west side of the parking lot clear for custom-

ers of Saks or for any other reason that would be conducive to the orderly placement and movement of cars on the parking lot. When executing this movement of Weekley's car and at a time when the jury could have found that he was within the course and scope of his employment, the "car took off and—went out the lot." There was sufficient evidence for the jury to find that after Ross was off the lot and into the street, that it was his intention to drive the car around the block and put it back on the lot. As a matter of fact there is no affirmative evidence to show that Ross intended to do otherwise. It is true that on cross-examination he was asked if he was going home to lunch at the time in question. He denied he was going home to lunch and there is no affirmative evidence to the contrary. Also, it is true that he was prohibited from taking cars off of the lot, except such as he drove to and from Saks' store. However, under the circumstances as related by Ross, he did not purposely and intentionally take the car off of the lot. What happened after he got into the car grew out of and was incident to his attempt to perform his employer's business. At least the evidence was such as to permit a jury to so find. Further, the evidence was such as to permit the jury to find that Ross was not engaged in some errand of his own. The fact is Saks admits that if the testimony of Ross is to be believed, there is a connection in the record between the business of Saks and the operation of the Weekley car by Ross. It says that without the benefit of this testimony the only inference in the record would be that Ross was going home for lunch and this clearly would not be within the scope of his employment by Saks. This statement of Saks, in its brief, is coupled with their contention that the testimony of Ross is so manifestly untrue and contrary to physical facts that a verdict could not be supported by it. We have ruled that the credibility of his testimony was for the jury,. and, therefore, plaintiff is entitled to the benefit of this testimony, which places

Saks in the position of admitting there was evidence sufficient to show that Ross was about his employer's business at the time of the collision. As we said heretofore, all of the testimony of Ross was for the jury's consideration. We rule that there was sufficient substantial evidence from which the jury could find that Ross was the servant of Saks at the time of the collision in question and was then acting within the course and scope of his employment. What we have said sufficiently disposes of a further contention made by Saks, that the testimony of Ross fails to show any direct economic benefit to it in his attempt to move the Weekley car from one side of the lot to the other.

■■ Saks makes another contention in opposition to that presented by plaintiff. It says that, assuming the testimony of Ross were true, it establishes as a matter of law that he had departed from the scope of his employment by his failure to return to the parking lot through the alley which ran behind the lot and was the most direct way of returning, citing Thomas v. McBride Exp. Co., Mo.App., 266 S.W.2d 11. The facts in the case of Thomas v. McBride Exp. Co., supra, are not analogous to those presented here for review. In the Thomas case the truck driver had admittedly turned aside from his customary route in reaching the MacArthur Bridge for the sole purpose of picking up his son. Because at the time of his deviation the truck driver was performing no service for his master, this court found that he was not within the scope of his employment at the time the collision took place. As we said before, the jury could find from the evidence in the instant case that Ross was performing a service for his employer at the time the collision took place. Also, as we said before, there was no affirmative evidence, which would permit us to say as a matter of law, that the sole motive and intent of Ross was to serve a private purpose at the time of the collision. An employee may, in certain instances, · deviate from the most direct route and still be in

his employer's service. There may be parallel routes leading in the direction of his ultimate destination, either of which could be said to be within his sphere of service, on the theory that it might be reasonably expected that he would, in the exercise of his best judgment, choose either while in the pursuit of his employer's business. Thomas v. McBride Exp. Co., supra. Again, we say, there was nothing in plaintiff's evidence from which we could say as a matter of law that Ross had departed from the prosecution of his employer's business and had launched on a personal purpose not connected with his employer's business. This is the test prescribed by the cases. Miceli v. Williams, supra.

■ Saks finally contends that "since plaintiff's own evidence and trial theory established that there was no prior notice to Ross and Saks of the defective condition of the brakes, no actionable negligence was proven against Saks." In this connection Saks asserts that evidence on which plaintiff sought to justify a respondeat superior submission against it is that Ross was forced off of the parking lot by the mechanical condition of the Weekley automobile and did not know of the defective brakes until a moment before the collision and that sudden and unexpected brake failure is a complete defense to Saks on the issue of the negligent operation of the automobile. In answer to this contention we first point out that it was not the alleged defective condition of the brakes that forced the car in question off of the parking lot. Secondly, plaintiff's trial theory was not predicated on any theory of faulty brakes. The only theory of negligence submitted to the jury is found in Instruction 1 wherein the court required the jury to find that Ross "operated said automobile at a rate of speed approximately 25 or 30 mph into the intersection of Euclid and McPherson, and failed to stop before entering said intersection." There was no required finding of faulty brakes or brake failure. The jury could have believed all of the testimony of Ross, with the exception of that wherein he said the brakes failed. They may have disbelieved that portion of the testimony of Ross and believed the testimony of Weekley wherein he said the brakes were in good working order and that Ross failed to stop at the intersection. Such a finding by the jury would not be contradictory of plaintiff's theory of recovery. Plaintiff was entitled to the benefit of such of the testimony of Ross as is favorable to him and not contradictory of an essential element of plaintiff's right to recover and other testimony of Ross may be ignored. Sheerin v. St. Louis Public Service Company, Mo., 300 S.W.2d 483.

■ We shall now discuss the correctness of the trial court's action in sustaining the motion for a directed verdict filed by Weisels-Hoehn. Before doing so, we shall state the evidence offered by defendant Weisels-Hoehn. Testifying for said defendant was Arthur C. Hoehn, President of said defendant company. He said that Dr. Flance and others were the owners of the Medical Building and that Weisels-Hoehn collected the rents and paid the help. This was done at the instruction of Dr. Flance. A monthly statement of the rents collected and the expenses paid was submitted to the owners.

Arthur C. Hoehn further testified that Randolph Milton was employed by Dr. Flance and that the Weisels-Hoehn Company never gave any instructions to Milton. All instructions to Milton were given by Dr. Flance. Hoehn further testified that Weisels-Hoehn had nothing to do with Ross and at no time gave him any instructions or directions. He said the only thing his company had to do with the parking lot was to pay the attendant employed by Dr. Flance out of the rents collected from the Medical Building. All of this was done on the instructions of Dr. Flance. He said that Weisels-Hoehn also paid for the tickets used for the Medical Building ten-

ants and patrons and paid for repairs, paint and taxes out of the rents collected, all on the instructions of Dr. Flance.

Randolph Milton testified that he worked for Dr. Flance and that Dr. Flance gives him instructions and tells him what to do.

Plaintiff contends that there was substantial evidence to support the jury finding that defendant Weisels-Hoehn was the managing agent for the Maryland Medical Building, and as such had a right of control of the parking lot and attendants. Plaintiff makes the further contention that there was substantial evidence to support the jury finding that defendant Ross was acting as a servant, and on behalf of Weisels-Hoehn at the time of the collision.

Plaintiff cites and relies on the case of Giles v. Moundridge Milling Co., 351 Mo. 568, 173 S.W.2d 745, loc. cit. 751. In that case the court, in stating the rule applicable to the facts, said:

"'* * * an agent who undertakes the sole and complete control and management of the principal's premises is liable to third persons, to whom a duty is owing on the part of the owner, for injuries resulting therefrom from his negligence in failing to make or keep the premises in a safe condition.' 2 Am.Jur., Sec. 334, p. 263. In other words, when an agent has or assumes full and complete control of his principal's premises, the agent's liability to the public or to invitees is the same as that of the principal or owner."

The court further said in the Giles case that under this rule the agent must have taken over the entire control of the land or building. Absent complete and entire control of the premises by the agent the court said in the Giles case at 173 S.W.2d loc. cit. 751:

"* * * the test is and should be whether he has breached his legal duty or been negligent with respect to some-

thing over which he did have control. 'If an agent has only a limited control over land or chattels he is subject to liability only to the extent that he is authorized to exercise such control.' * * * For the same reason an agent is not liable along with the owner for some condition over which he has no control and with respect to which he has no duty."

To the same effect see Peterson v. Brune, Mo., 273 S.W.2d 278; Edwards v. E. B. Murray & Company, Mo.App., 305 S.W.2d 702; and Brown v. Yeckel, Earickson & Co., Mo.App., 129 S.W.2d 66. Therefore, the principal test of the relationship of master and servant is control. Scherer v. Bryant, 273 Mo. 596, 201 S.W. 900, 902.

There is no need to here summarize the evidence touching on the agency relationship of Weisels-Hoehn insofar as Ross and the operation of the parking lot is concerned. It is sufficient to say there is no evidence in the record that would show any control on the part of Weisels-Hoehn over Ross, or, for that matter, over any phase of the operation of the parking lot. As a matter of fact the only possible connection it had with the operation of the parking lot was to pay the salary of Milton out of the rents it collected from the Medical Building. This it did on the instruction of Dr. Flance. The further fact is that the evidence fails to show that Weisels-Hoehn had the management and control of the Medical Building. The needed maintenance and repairs for that building were determined by Dr. Flance. All instructions to Milton were given by Dr. Flance, one of the owners of the Medical Building. None was ever given to Milton or Ross by Weisels-Hoehn. There is not a scintilla of evidence in the record that would justify a finding by the jury that Weisels-Hoehn exercised some measure of control over the operation of the parking lot. The trial court did not err when it sustained the motion of Weisels-Hoehn for a directed verdict.

The judgment is reversed and the cause remanded with directions to the trial court to set aside its order and judgment wherein it sustained the separate motion of the defendant Saks Fifth Avenue, Inc., to set aside the verdict and entered judgment in favor of Saks in accordance with its motion for a directed verdict, and said court is directed to reinstate the verdict of the jury in favor of plaintiff and against defendant Saks and to enter a judgment thereon. In all other respects the judgment is affirmed.

WOLFE, J., and JAMES D. CLEMENS, Special Judge, concur.