Herbert J. OCHS, Plaintiff-Respondent,

v.

Samuel R. WILSON and Majestic Building
Materials Corporation, a Corporation,
Defendants-Appellants.

No. 32821.

St. Louis Court of Appeals.

Missouri.

March 19, 1968.

Motion to Amend Opinion or for Rehearing
Denied April 19, 1968.

Joseph M. Settich, Clayton, Richard M. Stout, St. Louis, for defendants-appellants.

Murphy & Kortenhof, Ben Ely, Jr., St. Louis, for plaintiff-respondent.

DOERNER, Commissioner.

This suit for personal injuries and property damages grew out of successive collisions involving three motor vehicles. The first contact was between plaintiff's car and one driven by defendant George Joseph Diebling, followed immediately by the second collision between plaintiff's automobile and a dump truck owned by defendant Majestic Building Materials Corporation and being driven by defendant Samuel R. Wilson. Trial to a jury resulted in a verdict and judgment in favor of plaintiff for $7000 against all three defendants, and Wilson and Majestic prosecute this appeal. Diebling failed to perfect his separate appeal and it was dismissed.

Wilson and Majestic did not introduce any evidence after their joint motion for a directed verdict made at the close of plaintiff's evidence was denied. Plaintiff's sole submission as to those defendants was the alleged failure of Wilson to keep a careful lookout, and their initial contention in this appeal is that the court erred in denying their motion because plaintiff failed to make a submissible case against them on that specification of negligence. In our consideration of that question plaintiff is, of course, entitled to have the evidence reviewed from a standpoint favorable to him, and to have the benefit of all reasonable inferences which may be drawn therefrom.

The case is somewhat unusual in that neither plaintiff nor Diebling had any memory of the two collisions; witness Michael Rabbitt, who was a passenger in Diebling's car and whose deposition was read by plaintiff, was able to supply but little information; and the only other witness, Wilson, called by plaintiff, did not see the first collision, that between plaintiff's automobile and Diebling's vehicle. The collisions occurred on November 12, 1963 at approximately 5:45 P.M., on St. Charles Rock Road in St. Louis County, in the vicinity of a viaduct which carries that Road over Interstate 70. St. Charles Rock Road runs in an east-west direction and is a four-lane, non-divided highway. It was "just turning dark; it was dusk" according to plaintiff, his headlights were on, and a light rain or mist was falling. All that plaintiff could recall was that he was homeward bound, driving westwardly on St. Charles in the lane nearest the center line, and that in obedience to a stop light he brought his automobile to a halt at Fee Fee Road, which is about two or three blocks east of the area where the collisions occurred. The grade from Fee Fee Road to the viaduct is "slightly downgrade." While waiting for the light to change he noticed a truck stopped to his right, in the curb lane, which bore a sand company sign but he could not state the name of the company. He conceded that during his deposition he testified that when the light changed to green he started up, got ahead of the truck, and pulled into the curb lane, but at the trial he said that he could not recall pulling into the curb lane. Plaintiff's next recollection was that of awakening in the St. Louis County Hospital while 53 stitches were being taken to sew up his scalp.

Rabbitt, in his deposition, related that Diebling drove his car off of Interstate 70 by means of the exit ramp which enabled

one intending to drive eastwardly on St. Charles to enter that Road; and that, "I remember—all I remember is coming off of that exit into the lane closest to the middle of the center line and then we went up about one hundred feet and all of a sudden I saw two lights, headlights, coming toward me and that's all I remember." At one point Rabbitt stated that he was not sure whether the headlights he saw coming towards him were in the same lane that Diebling's car was in and that he didn't know what lane of traffic that car was in; but at another point he stated that, "to my knowledge" Diebling's automobile was in the eastbound lane nearest the center line. He fixed the speed of Diebling's car as about 25 or 30 miles per hour as it came off the exit, and said that while it was accelerated on St. Charles it didn't seem to be going fast at the time of the collision.

Wilson, called to the stand by plaintiff, as stated, testified that he was driving Majestic's tandem dump truck westwardly in the curb lane on St. Charles, that he did not see the actual collision between plaintiff's car and Diebling's but saw them "just after they hit." At that time plaintiff's car, " * * * was coming from the center part of the highway and spinning to the outside, * * * *" and it was then in both of the two westbound lanes, including the one in which his truck was traveling. Diebling's car, at the same time, " * * * was toward the center of the highway and looked like part of it was in the inside lane of the westbound side, and part of it was in the eastbound lane." It was also spinning. He was asked to give the positions of plaintiff's and Diebling's cars when they came to rest and stated that the front end of plaintiff's car was against a guy wire on the right hand (north) side of the road; and that Diebling's vehicle was sitting across the center line, with the front end facing south and about two-thirds of the automobile over in the westbound lane.

Plaintiff was permitted to read, as admissions against interest binding on Wilson but not on Majestic or Diebling, excerpts from the deposition of Wilson which plaintiff had taken prior to the trial. The substance of such testimony was that the vehicle he was operating at a speed of 38 miles per hour was a 1961 Mack 10 dump truck, the brakes and steering gear of which were in good condition; that it was dark, and a drizzling rain or mist was falling; that "There was no water on the street" and "They were not wet"; that his headlights were on; that visibility was good, and he could see 300 or 400 feet, maybe more; that he was 75 to 100 feet from plaintiff's car when he first saw it spinning; that he was not sure which way it was then pointed, but believed it was to the north, although he was not certain; and that the front of his truck came in contact with the rear section of plaintiff's car, near its trunk and bumper. He was asked:

" 'Q Would you tell me this, sir, traveling at, oh, a rate of speed of thirty-eight miles an hour with the means and appliances that you had on that truck to stop it, with safety to yourself and others and the weather conditions that were there at that time, what is the shortest distance that you can bring that truck to a stop at that speed under those conditions?'

" 'Q Oh, seventy-five feet.' "

In addition, plaintiff also read Wilson's answer to an interrogatory in which he stated that the speed of his truck at the time of its impact with plaintiff's vehicle was, " 'Approximately twenty-five miles per hour.' "

Later in the trial plaintiff again called Wilson to the stand, and in reply to plaintiff's counsel's questions he testified that with his headlights on visibility was "only fair" on the misty night. His "guess" was that the point where his truck came in contact with plaintiff's car was about 250 feet from the viaduct, and his guess was that from the crest of the hill to the east, to the point where the collision occurred, was 700 or 800 feet. When he first saw plaintiff's car the intervening distance was less than 100 feet and, "It was so close I knew I

was going to hit it \* \* \*." His speed was then 35 miles per hour, less than the speed limit of 40. He was asked to state the distance in which he could stop his truck taking into account its condition, safety to himself, the weather and other factors, and answered, "Well, you mean from the time I saw the danger until the time I got stopped. It would take probably over a couple of hundred feet by the time I could get it stopped." He conceded that he had answered 75 feet in his deposition. Asked to give his speed at the time of impact he estimated it at, " \* \* \* fifteen miles an hour, something like that" and when reminded of his answer to the interrogatory stated that he wasn't looking at his speedometer and his estimate was 15, 25. He again said plaintiff's car was spinning out of control when he first saw it, that he did not see it get hit by anything, "only heard it," and that there was nothing to obstruct his view. On cross-examination by his counsel he related that plaintiff's car, moving rapidly, hit a telephone pole on the north side of St. Charles simultaneously with his truck's contact with it, and bounced back. He was asked to explain the difference in his answers regarding his stopping distance and said that when questioned at the taking of his deposition he thought counsel was asking, " \* \* \* as to how good the brakes were working, and it would take that much with the brakes on. As a matter of fact, after the accident I could see the marks themselves where the wheels were sliding." He stated that he never measured the marks, " \* \* \* but there was a pretty good streak of them."

Roy Beck, Chief of Police of Bridgeton, was called by plaintiff and identified a report of an investigation of the accident which had been made by Officer George Booth, who was no longer connected with the Bridgeton Police Department but was working in St. Louis County. Over objection, the report was admitted into evidence as an exhibit but it has not been filed with us, as have other exhibits. We gather from the transcript that a diagram showed that

Diebling's car came to rest across the center line, plaintiff's car in the middle of the two westbound lanes, and Majestic's truck in the center of the two westbound lanes. The report also indicated that the bulk of the debris covered the westbound lane closest to the center line, although some was in the corresponding eastbound lane. None was in the westbound curb lane. Parenthetically, plaintiff's only submission against Diebling was on the theory that Diebling drove on the wrong side of the road.

Diebling, 17 years of age at the time of trial in October 1966, who appeared in his own behalf, testified that he was likewise rendered unconscious by the impact. He recalled that he and Rabbitt had driven in his father's Dodge station wagon to St. Charles to purchase gasoline, but stated that he had no recollection of whether he had driven the car there and could not recall driving the automobile on Interstate 70 on their return trip, or onto St. Charles; and that he did not remember anything at all about the accident.

 From a careful study of the foregoing evidence we are convinced that a jury could find that Wilson, in the exercise of the highest degree of care, could and should have seen the collision between plaintiff's car and Diebling's automobile. But mere proof of his failure to do so, without more, was not sufficient to sustain plaintiff's claim of *actionable negligence* for failure to keep a careful lookout. Cameron v. Small, Mo., 182 S.W.2d 565; Kenward v. Hultz, Mo.App., 371 S.W.2d 344. In order to make a submissible case it was incumbent upon plaintiff to produce substantial evidence from which the jury might reasonably find that Wilson, in the exercise of the highest degree of care, could and should have seen the danger or likelihood that his truck would collide with plaintiff's car in time thereafter to have taken available and effective precautionary action. Zalle v. Underwood, Mo., 372 S.W.2d 98; O'Neill v. Claypool, Mo., 341 S.W.2d 129; Graham

v. Conner, Mo.App., 412 S.W.2d 193. The evidence indicates that the period of time between the plaintiff's collision with Diebling and the moment when Wilson saw plaintiff's car spinning into his path was nothing more than a split second or "momentary interval," Hawkeye-Security Insurance Co. v. Thomas Grain Fumigant Co., Mo.App., 407 S.W.2d 622, 625. Undoubtedly recognizing that Wilson could not swerve his truck to the left because of Diebling's automobile spinning in that direction, nor to the right because plaintiff's car was spinning to the north, plaintiff sought to show that Wilson could have brought his truck to a stop before colliding with plaintiff's vehicle. So far as Majestic is concerned there was a total and complete lack of any evidence to support such a claim. The only evidence produced was that Majestic's truck, being operated by Wilson, was within 75 to 100 feet of plaintiff's vehicle when Wilson saw it, and that traveling at a rate of speed of 35 miles per hour the truck could not be stopped in less than 200 feet. Plaintiff argues that Wilson should have seen the likelihood of the collision between plaintiff's car and Diebling's automobile before it occurred and have taken precautionary measures. The weakness in that argument, however, is that there was no evidence to show when it reasonably became or should have become apparent to Wilson that such a collision was likely to occur. Assuming what was not directly shown, that Diebling's vehicle crossed the center line, Rabbitt's testimony indicates that Diebling's car did so only a brief instant before it collided with plaintiff's automobile. Wilson certainly was not required to take evasive action before he knew or should have known that such a collision was imminent. Zalle v. Underwood, supra; Graham v. Conner, supra. The conclusion is inescapable that plaintiff did not make a submissible case against Majestic and that its motion for a directed verdict should have been sustained.

■■ So far as the submissibility of his case against Wilson is concerned plaintiff relies entirely upon Wilson's statement in his deposition, admitted as an admission against his interest, that he could bring his 18,000 pound truck to a stop in 75 feet when it was traveling at 38 miles per hour. The question presented is whether we must blindly accept such evidence in determining whether plaintiff made a submissible case against Wilson. We think not. "Testimony which is manifestly untrue, incredible, impossible, or contrary to scientific principles established by the laws of physics or mechanics does not amount to substantial evidence, has no probative value, and is to be disregarded. * * *" Kelly v. Terminal RR Ass'n of St. Louis, Mo., 315 S.W.2d 699, 702. For examples, see in addition East v. McMenamy, Mo., 266 S.W.2d 728; Mahl v. Terrell, 342 Mo. 15, 111 S.W.2d 160; State ex rel. Kansas City Southern Ry. Co. v. Shain, 340 Mo. 1195, 105 S.W.2d 915; Kibble v. Quincy, O. & K. C. R. Co., 285 Mo. 603, 227 S.W. 42; Ewen v. Spence, Mo.App., 405 S.W.2d 521; Stonefield v. Flynn, Mo.App., 347 S.W.2d 472. The courts are reluctant to draw arbitrary conclusions so as to exclude sworn testimony, but we are not required to blindly accept that which is incredible and contrary to common human knowledge. East v. McMenamy, supra; Ewen v. Spence, supra; Stonefield v. Flynn, supra.

■■ Automobiles are so commonly and universally used that knowledge and information concerning their operation is widely known. Spoeneman v. Uhri, 332 Mo. 821, 60 S.W.2d 9. For that reason our courts have frequently taken judicial notice that an automobile traveling at a given speed may be stopped within certain limits, Reece v. Reed, Mo., 326 S.W.2d 67; De Lay v. Ward, 364 Mo. 431, 262 S.W.2d 628; Spoeneman v. Uhri, supra; and have likewise taken judicial notice that a motor vehicle traveling at a certain speed cannot be stopped within a stated number of feet. Danner v. Weinreich, Mo., 323 S.W.2d 746; Stonefield v. Flynn, supra. The court knows that at 38 miles per hour a car moves about 56.4 feet per second.

Danner v. Weinreich, supra; 9C Blashfield, Encyclopedia of Automobile Law, Perm.Ed., § 6237. We also take judicial notice, in the absence of proof of a longer time, that three-fourths of a second is required for the operator of a motor vehicle to react to the appearance of danger. Vietmeier v. Voss, Mo., 246 S.W.2d 785, 788. Hence Wilson's truck traveled approximately 42.3 feet during the time in which it took him to react. Assuming that plaintiff's car was 100 feet away, the distance most favorable to plaintiff, mathematically Wilson had slightly more than one second in time and about 57.7 feet in distance within which to bring his vehicle to a stop so as to avoid contact with plaintiff's car. Disregarding such factors as the misty night, the character and condition of the pavement, and the direction in which plaintiff's car was spinning (not shown), we are of the opinion that it is a matter of common knowledge, of which we may take judicial notice, that the actual braking distance alone of a motor vehicle traveling at 38 miles per hour would exceed 57.7 feet. And disregarding also any allowance for what is referred to as perception time as distinguished from reaction time, Amer.Jur. 2d, Desk Book, p. 456, Document No. 176, Wilson's testimony that he could have stopped his 18,000 pound truck within 75 feet is so contrary to common knowledge and experience that it was without probative value and must be rejected. Kelly v. Terminal RR Ass'n of St. Louis, supra; Danner v. Weinreich, supra; Ewen v. Spence, supra; Stonefield v. Flynn, supra. It follows that Wilson's motion for a directed verdict should likewise have been sustained.

Accordingly, the judgment against Wilson and Majestic Building Materials Company is reversed.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of this court.

Accordingly, judgment against Wilson and Majestic Building Materials Company is reversed.

ANDERSON, P. J., RUDDY, J., GEORGE W. CLOYD, Special Judge, concur.